EXHIBIT A

2601771v

**GENOVA BURNS LLC**
494 Broad Street
Newark, New Jersey 07102
TEL: (973) 533-0777
FAX: (973) 533-1112
Harris S. Freier, Esq. – 013412006
Attorneys for Plaintiff,
ADP, LLC

| | |
|---|---|
| ADP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CHASE AMUNDSON,<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION: ESSEX COUNTY<br><br>DOCKET NO.:<br><br>**CIVIL ACTION**<br><br>SUMMONS |

From the State of New Jersey

To the Defendant Named Above: **CHASE AMUNDSON**

     The Plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for the lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, New Jersey 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorneys whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with a fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

     If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If

judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the City Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

/s/ Michelle M. Smith
MICHELLE M. SMITH
Clerk of the Superior Court

DATED:  December 10, 2015

Name of Defendant to be Served:   **CHASE AMUNDSON**

Address of Defendant to be Served:  **5524 Knox Avenue South, Minneapolis, Plymouth County, Minnesota**

**GENOVA BURNS LLC**
Harris S. Freier, Esq. -013412006
HFreier@genovaburns.com
494 Broad Street
Newark, New Jersey 07102
(973) 533-0777
Fax: (973) 533-1112
Attorneys for Plaintiff, ADP, LLC

RECEIVED AND FILED

DEC 1 1 2015

SUPERIOR COURT OF NEW JERSEY
ESSEX VICINAGE

| | |
|---|---|
| ADP, LLC, | SUPERIOR COURT OF NEW JERSEY |
| | CHANCERY DIVISION: ESSEX COUNTY |
| Plaintiff, | DOCKET NO: _C - 266-15_ |
| v. | |
| CHASE AMUNDSON, | |
| Defendant. | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, ADP, LLC ("ADP"), for its Complaint for Injunctive and Other Relief against

Defendant Chase Amundson ("Defendant" or "Amundson"), states as follows:

## INTRODUCTION

1.       This action arises out of various breaches of contract, unfair competition, breach

of duty of loyalty, and misappropriation of trade secrets.

## JURISDICTION AND PARTIES

the years to select, hire, and train employees to build on and strengthen ADP's reputation and to develop and continue its relationships with its clients and its marketing partners.

8.    To promote valuable relationships between its employees and its clients and marketing partners, ADP has, among other things: recruited, hired and trained highly qualified sales employees and leadership; extensively marketed its services in the local community; provided competitive pricing in each market; established policies to provide quick and fair responses to any concerns made by clients; developed significant relationships with strategic marketing partners; and made customer service a primary goal and objective of its business.

9.    ADP's success in the industry is also largely attributable to its confidential, trade secret, and proprietary information regarding, among other things, its proprietary products, software, services, techniques, strategic business plans, client and prospect lists, client preferences, pricing and contract details, operational procedures, marketing and sales strategies, and referral sources.  ADP has invested significant time, money, and resources to generate, develop, and maintain its confidential, trade secret, and proprietary information.

### Amundson's Employment with ADP

10.    In or about April 2007, ADP hired Amundson as a Payroll/Retirement Services Representative.

11.    In his position as Payroll/Retirement Services Representative, Amundson was responsible for cultivating, developing, and maintaining business with clients and prospective clients in the greater Minneapolis-St. Paul, Minnesota region.

12.    On April 10, 2007, as a condition of his employment and/or continued employment with ADP, Amundson entered into a Sales Representative Agreement. (*See* Sales Representative Agreement, attached as **Exhibit A**).  The Sales Representative Agreement

contains certain reasonable restrictions designed to protect ADP's confidential business information and client goodwill, among other protectable business interests. Specifically, it includes the following non-solicitation provision:

> (a) Employee agrees that during the period commencing the date Employee becomes an employee of the Company and ending one year after the date Employee ceases to be an employee of the Company for any reason whatsoever (the "Non-Solicitation Period"), Employee shall not, on Employee's behalf or on behalf of any other person, corporation, partnership or other entity whatsoever (a "Person"), directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Person which was a client, bona fide prospective client or marketing partner of the Company before the date Employee ceases to be an Employee of the Company (the "Termination Date") that (i) was located in any territory Employee managed or to which Employee was assigned or covered during the two-year period prior to the Termination Date and/or (ii) Employee was assigned, managed and/or had knowledge of, contact or involvement with during the two-year period prior to the Termination Date, to sell, license or lease any software, product or service competitive or potentially competitive with any software, product or service sold, licensed, leased, provided or under development by the Company during the two-year period prior to the Termination Date, provided that the restrictions set forth in this paragraph shall only apply to clients, bona fide prospective clients or marketing partners of businesses of the Company with which the Employee was involved or exposed.

(*See* Exhibit A, ¶ 4(a)). The Sales Representative Agreement also provides the following non-disclosure provision:

> (b) During and after Employee's employment with the Company, Employee will not disclose to any Person any business methods, procedures, pricing and marketing structure and strategy, programs, forms, confidential information, trade secrets, the names and addresses of current clients, former clients and prospective clients of the Company, or other data and information relating to that Company, its vendors, licensors, marketing partners or clients, learned by Employee at any time during Employee's employment with the Company (the "Information"). Upon termination of Employee's employment with the Company, Employee will return all copies of all materials which belong to the Company (whether or not such materials were prepared by the Company) and which are in Employee's possession or over which Employee exercises any control.

(*See* Exhibit A, ¶ 4(b)). In short, Amundson agreed, for good and valuable consideration, during the Non-Solicitation period, never to solicit ADP's clients and prospective clients or disclose

ADP's confidential, proprietary, and trade secret information, as defined in the Sales Representative Agreement. Amundson further agreed to return all ADP materials upon separating from ADP. (*See id.*).

13.     In the Sales Representative Agreement, Amundson also agreed that any violation of the covenants set forth therein, including and especially those set forth above, would cause ADP irreparable harm:

> (e) Employee agrees that a violation of the foregoing covenants not to solicit, not to disclose, not to use and not to hire or any provisions thereof will cause irreparable injury to the Company. Accordingly, the Company shall be entitled, in addition to any other rights and remedies it may have at law or in equity, to an injunction enjoining and restraining Employee from doing or continuing to do any such act.

(*See* **Exhibit A,** ¶ 4(e)).

14.     The Sales Representative Agreement includes a New Jersey choice of law provision. (*See* **Exhibit A,** ¶ 7).

15.     ADP offers participation in a stock award program to certain employees (the "Plan"). Participation in the Plan is voluntary. To receive the stock offered and awarded under the Plan, employees must agree to be bound by certain restrictive covenants. (*See* the "2009 Restrictive Covenant Agreement," attached as **Exhibit B**). As part of the electronic acceptance process to receive the award of stock, an employee must accept the terms of these restrictive covenants. An employee cannot complete the process to accept a stock award without first accessing and accepting a restrictive covenant agreement.

16.     As a condition of receiving restricted stock under the Plan, Amundson entered into a Restrictive Covenant Agreement dated September 24, 2009. (*See*, Amundson agreed to, among other things, certain non-compete, non-solicit, non-interference, non-use, and non-disclosure obligations concerning ADP's confidential and proprietary business information, and

22.    Pursuant to the 2013 Restrictive Covenant Agreement, Amundson agreed to, among other things, certain non-compete, non-solicit, non-interference, non-use, and non-disclosure obligations concerning ADP's confidential and proprietary business information, and the return of such information and ADP property upon Amundson's separation from employment. The pertinent provisions and restrictive covenants provide in relevant part:

**1. Definitions.**

d. **"Competing Business"** means any individual (including me), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is engaged in any business or enterprise that is the same as, or substantially the same as, the Business of ADP for that part of the business in which I have worked or to which I have been exposed during my employment with ADP (regardless of whether I worked only for a particular segment of that part of the business in which I worked—for example, business segments based on the number of employees a Client has or a particular class of business using an ADP product or service).

h. **"Territory"** means the geographic area where I worked, represented ADP, or had Material Business Contact with ADP's Clients in the two (2) year period preceding the termination of my employment with ADP.

**3. Non-Competition.** I agree that during my employment and for a period of twelve (12) months from the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, directly or indirectly, own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business anywhere in the Territory where doing so will require me to (i) provide the same or substantially similar services to a Competing Business as those which I provided to ADP while employed, or (ii) use or disclose ADP's trade secrets. However, after my voluntary or involuntary termination of my employment for any reason and with or without cause, nothing shall prevent me from owning, as an inactive investor, securities of any competitor of ADP which is listed on a national securities exchange.

**4. Non-Solicitation of and Non-Interference with Clients, Business Partners, and Vendors.**

a. **Clients:** I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly, solicit, divert, appropriate, or accept any business from, or attempt to solicit, divert, appropriate, or accept any business from any Client for the purposes of providing products or services that

are the same as or substantially similar to those provided in the Business of ADP, for any Client: (i) whom ADP provides products or services in connection with the Business of ADP; (ii) whom ADP has provided products or services in connection with the Business of ADP and with whom ADP reasonably expects business within the two (2) year period following my termination of employment from ADP; (iii) whom ADP has actively solicited in connection with the Business of ADP within the two (2) year period prior to my termination of employment from ADP; or (iv) about whom I have any trade secret information. I also agree that I will not wrongfully induce or encourage or attempt to wrongfully induce or encourage any Clients to cease doing business with ADP or materially alter their business relationship with ADP.

b. **Business Partners:** I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly engage, contract with, solicit, divert, appropriate or accept any business from, or attempt to engage, contract with, solicit, divert, appropriate or accept any business from any Business Partner to provide to me or any Competing Business any product or service that is (a) the same as or substantially similar to the product or service provided to ADP and which ADP uses for, uses for obtaining, or distributes to, its Clients or (b) specialized, customized or designed by the Business Partner for ADP. This provision applies only to any Business Partner: (i) whom ADP currently has a commercial or business relationship with ADP in connection with the Business of ADP; (ii) whom ADP has had a commercial or business relationship in connection with the Business of ADP and with whom ADP reasonably expects business within the two (2) year period following my termination of employment from ADP; (iii) whom ADP has actively solicited for a commercial or business relationship in connection with the Business of ADP within the two (2) year period prior to my termination of employment from ADP; or (iv) about whom I have any trade secret information. I also agree that I will not wrongfully induce or encourage or attempt to wrongfully induce or encourage any Business Partner to cease doing business with ADP or materially alter their business relationship with ADP.

c. **Vendors:** I agree that I will not wrongfully induce or encourage or attempt to wrongfully induce or encourage any Vendor to cease doing business with ADP or materially alter their business relationship with ADP.

\*             \*             \*

6. **Non-Disclosure and Non-Use of Confidential Information and Trade Secrets.** During my employment, except as authorized and required to perform my duties for ADP, and after the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not disclose, use, reproduce, distribute, or otherwise disseminate ADP's Confidential Information

or trade secrets or take any action causing, or fail to take any action necessary, in order to prevent any such information to lose its character or cease to qualify as Confidential Information or a trade secret. I agree to inquire with ADP if I have any questions about whether particular information is Confidential Information or a trade secret before using or disclosing such information. I also agree to immediately return to ADP all property belonging to ADP such as keys, credit cards, telephones, tools, equipment, computers, and electronic storage devices, as well as all originals, copies, or other physical embodiments of ADP's Confidential Information or trade secrets (regardless of whether it is in paper, electronic, or other form), including any such information in any programs, business forms, manuals, correspondence, files, databases, or on computer disks or any other storage medium, whether or not owned or controlled by me or ADP (e.g., social and business networking websites, web-based email servers, or cloud storage services), immediately upon termination of my employment or upon any earlier request by ADP, and I agree not to keep or distribute any copies, electronic or otherwise, of any of the foregoing. I also understand that my obligations under this paragraph, as well as the other covenants in this Agreement, extend to my activities on the internet, including my use of business oriented social networking sites such as LinkedIn and Facebook.

7. **Prior Agreements and Disclosure of Agreement to Third Parties.** I represent that I am not a party to any agreement with any former employer or any other person or entity containing any non-disclosure, non-compete, non-solicitation, non-recruitment, intellectual property assignment, or other covenants that will affect my ability to devote my full time and attention to the Business of ADP that has not already been disclosed to ADP in writing. I also agree to provide a copy of this Agreement to any subsequent employer, person, or entity to which I intend to provide services that may conflict with any of my obligations in this Agreement prior to engaging in any such activities and to provide ADP in writing the name and address of any such employer, person, or entity and a description of the services I intend to provide prior to engaging in any such activities. I agree that ADP may also provide a copy of this Agreement or a description of its terms to any Client, subsequent employer, or other third party at any time as it deems necessary to protect its interests, and I agree to indemnify ADP against any claims and hold ADP harmless from any losses, costs, fees, expenses, and damages arising out of my failure to comply with this paragraph.

*          *          *

10. **Survival.** All non-competition, non-solicitation, non-disclosure and non-use, non-recruiting, intellectual property, and Agreement disclosure obligations under paragraphs three (3) through seven (7) of this Agreement shall survive the voluntary or involuntary termination of my employment for any reason and with or without cause, and no dispute regarding any other provisions of this Agreement

or regarding my employment or the termination of my employment shall prevent the operation and enforcement of these obligations.

**11. Relief, Remedies, and Enforcement.** I acknowledge that ADP is engaged in a highly competitive business, and the covenants and restrictions contained in this Agreement, including the geographic and temporal restrictions, are reasonably designed to protect ADP's legitimate business interests, including ADP goodwill and client relations, Confidential Information and trade secrets, and the specialized skills and knowledge gained by me and ADP's other employees during our employment. I acknowledge and agree that a breach of any provision of this Agreement by me will cause serious and irreparable damage to ADP that will be difficult to quantify and for which a remedy at law for monetary damages alone may not be adequate. Accordingly, I agree that if ADP should bring an action to enforce its rights under this Agreement and ADP establishes that I have breached or threatened to breach any of my obligations under this Agreement, ADP shall be entitled to injunctive relief. I also agree that nothing in this Agreement shall be construed to prohibit ADP from pursuing any and all other legal or equitable remedies available to it for breach of any of the provisions of this Agreement, including the disgorgement of any profits, commissions, or fees realized by me, any subsequent employers, any business owned or operated by me, or any of my agents, heirs, or assigns. I agree that if ADP substantially prevails in any litigation arising out of or relating to this Agreement (including, without limitation, paragraph nine (9) above), ADP shall be entitled to recovery of its reasonable attorneys' fees and associated costs, in addition to any other relief mentioned above. I also agree that that the knowledge, skills, and abilities I possess at the time of commencement of my employment are sufficient to permit me to earn a livelihood satisfactory to me without violating any provision of paragraphs three (3) through seven (7) above, for example, by using such knowledge, skills, and abilities, or some of them, in the service of business that is not competitive with ADP.

**12. Tolling.** The restricted time periods in paragraphs three (3) through six (6) above shall be tolled during any time period that I am in violation of such covenants, as determined by a court of competent jurisdiction, so that ADP may realize the full benefit of its bargain. This tolling shall include any time period during which litigation is pending, but during which I have continued to violate such protective covenants and a court has declined to enjoin such conduct or I have failed to comply with any such injunction.

**13. Entire Agreement and Validity of Terms.** I agree that I do not rely, and have not relied, upon any representation or statement not set forth herein by ADP or any of ADP's agents, representatives, or attorneys, and that this Agreement may be changed only by a subsequent agreement in writing signed by both parties. I understand that I may have an existing agreement(s) with ADP, through acquisition of a prior employer or otherwise, that may include the same or similar covenants as those in this Agreement, and acknowledge that this Agreement is

meant to supplement any such agreement(s) such that the covenants in the agreements that provide ADP with the greatest protection enforceable under applicable law shall control, and that the parties do not intend to create any ambiguity or conflict through the execution of this Agreement that would release me from the obligations I have assumed under the protective covenants in any of these agreements.

14. **Electronic Signature.** I agree that ADP may enforce this Agreement with a copy for which I have provided an electronic signature.

         *          *          *

17. **Legal Counsel.** I agree that I have read this Agreement before signing it, understand its terms, and that I have had the opportunity to have legal counsel review this agreement, prior to signing it, and I acknowledge that I have not been forced or coerced in any manner to sign this Agreement and do so of my own free will.

(*See* Exhibit F, ¶¶ 3-4, 6-7, 10-14, 17).

23.     Amundson reaffirmed the same obligations set forth above when he received another restricted stock award and, in return, executed the same restrictive covenant agreement on or about September 2, 2014. (*See* the "2014 Restrictive Covenant Agreement," attached as **Exhibit G**) (the 2009 Restrictive Covenant Agreement; 2010 Restrictive Covenant Agreement, 2011 Restrictive Covenant Agreement, 2012 Restrictive Covenant Agreement, 2013 Restrictive Covenant Agreement, and 2014 Restrictive Covenant Agreement are collectively referred to as the "Restrictive Covenant Agreements").

<u>Training, Customer Contact, and Information</u>
<u>Provided to Amundson by ADP</u>

24.     ADP provided Amundson with specialized training unique to ADP throughout his employment at ADP.

25.     While employed at ADP, Amundson had substantial and direct contact with ADP's prospective and current clients.  Such contact included regular meetings, telephone conversations regarding clients' existing business with ADP, and meetings with other ADP

employees regarding client needs and prospective opportunities. Amundson also met and spoke regularly to prospective clients regarding services ADP could provide to them. Further, Amundson had substantial and direct contact with ADP's marketing partners.

26.     Throughout the course of his employment with ADP, Amundson also had access to and possession of, and used on a regular basis, ADP's confidential, proprietary, and trade secret information. Such information includes, but is not limited to, ADP's confidential business methods, procedures, pricing, and marketing strategy; client information, including the names, addresses, preferences, and needs of ADP clients; information regarding bona fide prospective clients, vendors, and strategies; information regarding the terms of clients' contracts; marketing partner information, including the names, addresses, preferences, and needs of ADP's marketing partners; and employee information, including but not limited to sale information, and compensation plan and performance information, as well as other proprietary know-how and confidences of ADP and its businesses (collectively, the "Proprietary Information").

27.     The Proprietary Information derives independent economic value from not being generally known to and not being readily ascertainable through proper means by competitors or others who can obtain economic value from its disclosure or use.

28.     The Proprietary Information is closely guarded by ADP. ADP entrusted Proprietary Information to Amundson pursuant to and in reliance upon the Sales Representative Agreement and Restrictive Covenant Agreements. ADP made Proprietary Information known to Amundson to enable him to effectively carry out his responsibilities on behalf of ADP.

29.     ADP has taken reasonable steps to maintain the secrecy of its Proprietary Information. Such efforts include, among other things, requiring employees to enter into confidentiality and restrictive covenant agreements such as the numerous ones entered into by

Amundson.  ADP also, among other things, provides employees with access to Proprietary Information on a need-to-know basis, requires security and password protection on its work locations and systems, and reminds and trains its employees of the sensitive nature of this information.

### Amundson's Wrongful Conduct

30.     Amundson has breached the Sales Representative Agreement and the Restrictive Covenant Agreements, as well as his duty of loyalty and other legal obligations to ADP.

31.     On or about September 3, 2015, Amundson notified ADP that he would be voluntarily separating his employment from ADP.

32.     ADP has learned that, in September 2015, Amundson accepted a position in the greater Minneapolis-St. Paul area as Strategic Account Manager at The Ultimate Software Group, Inc. ("USG") – a direct competitor of ADP's. (*See* Amundson's LinkedIn Page, attached as **Exhibit H**).

33.     USG states that it "unites all aspects of HR, payroll, and HR talent management." USG also states that it provides services "with comprehensive capabilities and simplicity of use to make your life easier.  We give you tools to manage every workforce need—to recruit and retain a high-performing workforce.  You get HR, payroll, and talent management in a single solution that seamlessly connects people globally with the information and resources they need to work more effectively." (*See* USG About Us Page and Human Capital Management Solutions Page, attached as **Exhibit I**).

34.     While employed at ADP, Amundson was responsible for selling and managing a sales staff that was responsible for selling the same type of services that USG sells.

{5851605:}                                    14

35.     Upon information and belief, in his position as Strategic Account Manager at USG, Amundson is performing the same or substantially similar job functions as those he performed on behalf of ADP in the same territory.  Amundson's employment at USG is forbidden by his non-compete obligations set forth in the Restrictive Covenant Agreements.  (*See* Exhibits  B – E, ¶1; Exhibits F – G, ¶3).

36.     Because Amundson is performing the same job functions on behalf of USG as he did on behalf of ADP in the same sales territory, upon information and belief, Amundson has and continues to solicit business from ADP's current and prospective clients, business partners, and vendors.  Such conduct constitutes a violation of the Sales Representative Agreement and the Restrictive Covenant Agreements.  (*See* Exhibit A, ¶4; Exhibits  B – E, ¶3; Exhibits F – G, ¶4(a)-(c)).

37.     Further, because Amundson is performing the same job functions on behalf of USG as he did on behalf of ADP in the same sales territory, upon information and belief, Amundson has and continues to or inevitably will wrongfully use and disclose ADP's Proprietary Information for the benefit of USG and to the detriment of ADP.  Such conduct constitutes a violation of the Sales Representative Agreement and the Restrictive Covenant Agreements.  (*See* Exhibit A, ¶ 4; Exhibits  B – E, ¶ 2; Exhibits F – G, ¶ 6).

38.     Based upon Amundson's conduct in violation of the Sales Representative Agreement and the Restrictive Covenant Agreements, ADP sent Amundson a letter dated September 10, 2015 in which ADP outlined Amundson's various violations.  (*See* the "Adequate Assurances Letter," attached as Exhibit J).  ADP also informed Amundson of its desire to not file a lawsuit, but that ADP would be forced to protect its interests by enjoining Amundson's improper conduct if he failed to provide ADP with adequate assurances that he would refrain

from continuing to engage in conduct explicitly prohibited by the Sales Representative Agreement and the Restrictive Covenant Agreements. ADP also demanded that Amundson provide ADP with information related to his employment at USG, as Amundson was required to do before accepting a position with a direct competitor, like USG. (*See* **Exhibit J**). In the Adequate Assurances Letter, ADP also instructed Amundson that if he failed to provide ADP with the assurances and information requested by September 25, 2015, ADP must assume that Amundson intends to continue to work in violation of the Sales Representative Agreement and the Restrictive Covenant Agreements.

39.     Amundson did not respond to ADP's Adequate Assurances Letter. ADP therefore was forced to file this lawsuit to protect its rights.

<u>Irreparable Harm to ADP</u>

40.     Amundson's conduct is unfairly harming ADP's business. The harm is irreparable.

41.     If Amundson's conduct is not enjoined, Amundson will continue to impermissibly compete and to disclose and use ADP's Proprietary Information to ADP's competitive disadvantage. ADP will lose clients and prospective clients, and also stands to lose employees, vendors, and marketing partners. Furthermore, ADP will lose goodwill and the referral business of its clients and marketing partners, as well as revenues in an amount that cannot be readily ascertained.

42.     As a direct result of Amundson's actions, ADP has lost, and will continue to lose, the value of its Proprietary Information. Such information was developed and maintained at great expense and effort on the part of ADP and belongs to ADP. The ADP proprietary and

trade secret information that Amundson obtained and learned while employed at ADP has aided and will continue to aid Amundson in his employment with USG, a direct competitor of ADP.

43.     Unless enjoined, Amundson will continue to breach the Sales Representative Agreement, the Restrictive Covenant Agreements, his loyalty and legal duties and obligations by working at USG, disclosing ADP's confidential and proprietary information, and misusing ADP's confidential and proprietary information to his and USG's advantage and to the competitive disadvantage of ADP.

44.     If Amundson is not immediately barred from violating the Sales Representative Agreement and Restrictive Covenant Agreements and from using and disclosing ADP's confidential and Proprietary Information, ADP will continue to suffer irreparable harm. ADP lacks an adequate remedy at law to address the harm that it is suffering as a result of Amundson's actions. Indeed, Amundson agreed that any violation of the Sales Representative Agreement and Restrictive Covenant Agreements would irreparably harm ADP and therefore would entitle ADP to injunctive relief to prevent further damage to ADP. (*See* **Exhibit A, ¶ 4(e); Exhibits B - E, ¶ 6; Exhibits F - G, ¶ 11**).

45.     Due to Amundson's divulgence and/or inevitable divulgence of Proprietary Information, as well as the loss of ADP's competitive edge, client goodwill and unfair competition, ADP is entitled to injunctive relief barring Amundson from violating his nondisclosure and non-solicitation obligations and from continuing to unfairly compete against ADP and wrongfully use and disclose its confidential, proprietary, and trade secret information, as set forth more fully below. ADP is also entitled to damages, including lost profits, interest, costs, and attorneys' fees.

46.    By ignoring the clear and irrefutable restrictive covenants contained in the seven (7) different agreements Amundson executed and by ignoring ADP's Adequate Assurances Letter, Amundson's various and continuous breaches of the Sales Representative Agreement and Restrictive Covenant Agreements constitutes the type of willful, fraudulent, and malicious conduct that warrants punitive damages.

**Count I**
**Breach of Contract**

47.    The preceding paragraphs are re-alleged and incorporated by reference.

48.    Amundson voluntarily entered into the Sales Representative Agreement and the Restrictive Covenant Agreements with ADP.

49.    The Sales Representative Agreement and the Restrictive Covenant Agreements are each valid, binding, and enforceable contracts.

50.    The Sales Representative Agreement and the Restrictive Covenant Agreements are each supported by adequate, legal consideration.

51.    ADP fully performed as required under the Sales Representative Agreement and Restrictive Covenant Agreements.

52.    Amundson breached, and will inevitably continue to breach, the Sales Representative Agreement and Restrictive Covenant Agreements by engaging in the conduct described herein, including working for a competitor of ADP in the same or similar capacity, soliciting ADP's clients and prospective clients, vendors, and marketing and business partners, wrongfully using and disclosing ADP's confidential, proprietary, and trade secret information, and wrongfully obtaining or retaining ADP's confidential, proprietary, and trade secret electronic documents.

53.    As a result of Amundson's breaches, ADP has suffered damages.

54.     As a result of Amundson's breaches, ADP has suffered irreparable injury, and ADP imminently will continue to suffer irreparable injury for which there is no adequate remedy at law.

55.     ADP is entitled to damages, costs, and disbursements incurred in this action, including attorneys' fees, and to injunctive relief against further breaches of the Sales Representative Agreement and the Restrictive Covenant Agreements.

<u>Count II</u>
<u>Breach of Duty of Loyalty</u>

56.     The preceding paragraphs are re-alleged and incorporated by reference.

57.     As an employee of ADP, Amundson owed his employer an undivided duty of loyalty including, but not limited to, the duty to advance the interests of ADP, the duty to preserve ADP's Proprietary Information and the duty not to use any of ADP's Proprietary Information in any way adverse to ADP's interests.

58.     Following his separation, Amundson continues to owe a duty of loyalty to ADP not to make use of its confidential and Proprietary Information.

59.     Amundson breached his duty of loyalty to ADP through his use and disclosure of ADP's Proprietary Information, and through his work for a direct competitor in contravention of the Sales Representative Agreement and the Restrictive Covenant Agreements.

60.     Amundson's breaches of the Sales Representative Agreement and the Restrictive Covenant Agreements have wrongfully benefitted both Amundson and USG, which, in turn, have caused ADP to suffer damages.

61.     As a result of Amundson's breaches, ADP has suffered irreparable injury, and ADP will imminently suffer further irreparable injury for which there is no adequate remedy at law.

62.    ADP is entitled to damages, costs and injunctive relief against further breaches of the Sales Representative Agreement and the Restrictive Covenant Agreements by Amundson.

## Count III
## Misappropriation of Trade Secrets

63.    The preceding paragraphs are re-alleged and incorporated by reference.

64.    Amundson acquired ADP's confidential and Proprietary Information by improper means.

65.    Amundson has used and disclosed, or will inevitably use and/or disclose, ADP's confidential and Proprietary Information without authorization or consent from ADP.

66.    The confidential and Proprietary Information wrongfully disclosed, or that will inevitably be used and/or disclosed, by Amundson constitutes trade secret information that is owned by ADP.  Such information derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and also because ADP has undertaken reasonable efforts under the circumstances to ensure and maintain the secrecy of such information.

67.    As a result of Amundson's use and disclosure, or inevitable use and/or disclose, of ADP's trade secret information, ADP has suffered damages.

68.    As a result of Amundson's use and disclosure, or inevitable use and/or disclose, of ADP's trade secret information, ADP has suffered irreparable injury and there is immediate and imminent danger that ADP will continue to suffer irreparable injury for which there is no adequate remedy at law.

{5851605:}                                          20

69.   ADP is entitled to injunctive relief against further use and disclosure, or inevitable use and/or disclose, of its trade secrets by Amundson, damages, costs, and reasonable attorneys' fees.

## Count IV
## Unfair Competition

70.   The preceding paragraphs are re-alleged and incorporated by reference.

71.   Amundson's aforementioned unlawful, unfair, and fraudulent behavior constitutes unfair competition.

72.   Amundson's conduct was undertaken with the intent to interfere with and disrupt ADP's business.

73.   Amundson's acts were resulting and continue to result in Amundson's and USG's wrongfully procured competitive advantage to the competitive disadvantage of ADP.

74.   Amundson's actions are intentional, malicious, and unjustified in law.

75.   As a proximate result of Amundson's actions and conduct amounting to unfair competition, ADP has been and will continue to be irreparably injured, including, but not limited to, the loss of its competitive edge, client goodwill, confidential information and trade secrets.

76.   Unless restrained preliminarily and permanently, Amundson will continue to violate ADP's rights through his unfair competition. Accordingly, an injunction restraining and enjoining Amundson from continuing his actions are the only remedies that will afford ADP meaningful relief.

77.   Due to Amundson's unfair competition, the misuse and disclosure of confidential information and trade secrets, as well as loss of its competitive edge, client goodwill and unfair competition, ADP is entitled to injunctive relief as well as damages, including, but not limited to, lost profits, inclusive of interest, costs and attorneys' fees.

## REQUEST FOR RELIEF

WHEREFORE, ADP respectfully requests:

A.    That this Court enter an Order restraining and enjoining Amundson from directly or indirectly;

        (i)    Working or performing any services for any competitor of ADP, including, without limitation, The Ultimate Software Group, Inc., for a period of twelve (12) months from the date of entry of the injunctive relief order;

        (ii)    Soliciting, contacting, calling upon, communicating with or attempting to communicate with any ADP client, prospective client, vendor, marketing partner, or business partner, for a period of twelve (12) months from the date of entry of the injunctive relief order;

        (iii)    Soliciting or being involved in the recruitment or hire of any employee of ADP for a period of twelve (12) months from the date of entry of the injunctive relief order;

        (iv)    Violating the terms and conditions of the Sales Representative Agreement and Restrictive Covenant Agreements with ADP;

        (v)    Using or disclosing at any time in the future, ADP's confidential, proprietary, or trade secret business information or property;

        (vi)    Interfering in any way with any current contract, client relationship, prospective client relationship, or marketing partner relationship of ADP; and

        (vii)    Breaching any loyalty obligation to ADP, including, but not limited to, appropriating any business opportunity of ADP, engaging in deceptive acts or statements with regard to ADP's abilities, experiences, and personnel, and from otherwise attempting to gain unfair advantage against ADP.

B.    That Amundson be ordered to return all ADP property to ADP, including, but not limited to, requests for proposal, requests for bid, client correspondence, meeting minutes, notes, marketing data, prospect meeting data, proposals, faxes, pricing contracts, contracts awarded, marketing brochures, recommendations, including, but not limited to, vendor recommendations,

{5851605;}

22

marketing database, marketing plans, costs, client lists, prospect lists, marketing partner information, client contact information, prospect client contact information, competitive bid information, strategic planning information, alliance relationships, employee lists, client information, internal strengths and weakness information, marketing plans, business plans, project costs and all other confidential, proprietary or trade secret information, confidential client and vendor information and confidential and proprietary marketing partner information, in any form including electronic and hard copy form;

C.     That Amundson be restrained from destroying or disposing of any paper documents in his possession, custody or control, or deleting anything from any computers to which he has access, including smartphones, PDAs or any other electronic storage devices, including e-mail, databases, and any other electronically stored data that relate to, evidence or concern any of the issues involved in this litigation and that Amundson immediately turn over all of the electronic devices in his possession, custody or control for non-destructive imaging to preserve the contents of these electronic devices;

D.     That after the trial of this action, a Permanent Injunction be issued; and

E.     That ADP be granted as relief money damages, including exemplary and punitive damages, lost profits, all other appropriate damages, as well as all interest, costs and disbursements of this action, including attorneys' fees, as specifically provided for and agreed upon in the Sales Representative Agreement and Restrictive Covenant Agreements, and such other and further relief and this Court may deem just and proper.

Dated this 10th day of December 2015          Respectfully submitted,

GENOVA BURNS LLC
Harris S. Freier, Esq. -013412006
HFreier@genovaburns.com
494 Broad Street
Newark, New Jersey 07102
TEL: (973) 533-0777
FAX: (973) 533-1112
Attorneys for Plaintiff, ADP, LLC

## DESIGNATION OF TRIAL COUNSEL

PLEASE TAKE NOTICE that Harris S. Freier, Esq. of Genova Burns LLC, one of the attorneys for ADP, LLC, is hereby designated as trial counsel for ADP, LLC pursuant to R. 4:25-4.

GENOVA BURNS LLC.
One of the Attorneys for
Plaintiff, ADP, LLC

By:_____
    HARRIS S. FREIER-013412006

Dated: December 10, 2015

## CERTIFICATION UNDER R. 4:5-1

I certify that the matter in controversy is not the subject of any other action or arbitration proceeding and that no other parties should be joined in this action.

GENOVA BURNS LLC
One of the Attorneys for
Plaintiff, ADP, LLC

By: _____
HARRIS S. FREIER-013412006

Dated: December 10, 2015

## R. 1:38-7(B) CERTIFICATION

I certify that confidential personal identifiers have been redacted from documents submitted to the Court, and will be redacted from all documents submitted in the future in accordance with R.1:38-7(b).

GENOVA BURNS LLC
One of the Attorneys for
Plaintiff, ADP, LLC

By: _____
HARRIS S. FREIER

Dated: December 10, 2015

04/10/2007 14:10 FAX 952 814 5899        ADP                                    ⌀005

TO BE PREPARED AND
SIGNED IN DUPLICATE

### SALES REPRESENTATIVE'S AGREEMENT

AGREEMENT dated the _____ day of _____, 200___, between Automatic Data

Processing, Inc., a Delaware corporation, or one of its divisions, subsidiaries or affiliates (collectively, the "Company") with offices at

_____ and _____ (the "Employee")

residing at _____

In consideration of the covenants and agreements contained herein, the Company and Employee agree as follows:

1.  **NATURE OF SERVICES.** The Company hereby employs Employee, and Employee accepts employment with the Company, as a Sales Representative. Employee shall devote Employee's best efforts and entire business time to the performance of Employee's duties and responsibilities hereunder. Employee agrees that Employee has read or will immediately read the Company's Code of Business Conduct and Ethics and the Employee will conduct himself or herself in accordance with that and all other Company policies throughout Employee's employment with the Company. Employee understands that the Company is committed to ethical behavior in business and Employee agrees that Employee will strictly adhere to the highest standards of ethics at all times when representing the Company.

2.  **COMPENSATION.** Employee's compensation as a Sales Representative of the Company is as set forth in the Sales Compensation Plan which may be amended at any time at ADP's discretion.

3.  **OTHER EMPLOYEE BENEFITS.** Employee shall be eligible to participate in any group health benefits, life insurance, stock purchase, vacation and other employee benefit plans in accordance with the terms and conditions of those plans.

4.  **NON-SOLICITATION, NON-DISCLOSURE, NON-USE AND NON-HIRE.**
    (a)  Employee agrees that during the period commencing the date Employee becomes an employee of the Company and ending one year after the date Employee ceases to be an employee of the Company for any reason whatsoever (the "Non-Solicitation Period"), Employee shall not, on Employee's behalf or on behalf of any other person, corporation, partnership or other entity whatsoever (a "Person"), directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Person which was a client, bona fide prospective client or marketing partner of the Company before the date Employee ceases to be an Employee of the Company (the "Termination Date") that (i) was located in any territory Employee managed or to which Employee was assigned or covered during the two-year period prior to the Termination Date and/or (ii) Employee was assigned, managed and/or had knowledge of, contact or involvement with during the two-year period prior to the Termination Date, to sell, license or lease any software, product or service competitive or potentially competitive with any software, product or service sold, licensed, leased, provided or under development by the Company during the two-year period prior to the Termination Date, provided that the restrictions set forth in this paragraph shall only apply to clients, bona fide prospective clients or marketing partners of businesses of the Company with which the Employee was involved or exposed.
    (b)  During and after Employee's employment with the Company, Employee will not disclose to any Person any business methods, procedures, pricing and marketing structure and strategy, programs, forms, confidential information, trade secrets, the names and addresses of current clients, former clients and prospective clients of the Company, or other data and information relating to the Company, its vendors, licensors, marketing partners or clients, learned by Employee at any time during Employee's employment with the Company (the "Information"). Upon termination of Employee's employment with the Company, Employee will return all copies of all materials which belong to the Company (whether or not such materials were prepared by the Company) and which are in Employee's possession or over which Employee exercises any control.
    (c)  Employee will not, during the Non-Solicitation Period, except in the course of fulfillment of Employee's duties as an employee of the Company, use or act upon in any way, directly or indirectly, any information which became known to Employee during the course of Employee's employment with the Company concerning the identity or business activity of any current clients, former clients, prospective clients and/or marketing partners of the Company.
    (d)  During the Non-Solicitation Period, Employee will not, directly or indirectly, hire, solicit, or encourage to leave the Company's employ any employee of the Company, or solicit, hire or contract with any former employee of the Company within one year after the date such person ceases to be an employee of the Company.
    (e)  Employee agrees that a violation of the foregoing covenants not to solicit, not to disclose, not to use and not to hire or any provisions thereof will cause irreparable injury to the Company. Accordingly, the Company shall be entitled, in addition to any other rights and remedies it may have at law or in equity, to an injunction enjoining and restraining Employee from doing or continuing to do any such act.
    (f)  For the purposes of this Agreement, the term "client" and "prospective client" shall include without limitation any entity to or for whom the Company provides or proposes to provide, as applicable, products or services either directly or indirectly, whether as a vendor, subcontractor to another vendor or otherwise, whether or not privity of contract exists between the Company and such entity.

04/10/2007 14:10 FAX 952 514 3899          ADP                                    Ø 006

5.    PATENTS AND OTHER DEVELOPMENTS.  Employee understands and acknowledges that the Company shall have exclusive rights to anything relating to its actual or prospective business which Employee conceives or works on while employed by the Company.  Accordingly, Employee:

(a)    will promptly and fully disclose all such items to the Company and will not disclose such items to any other person or entity (other than employees of the Company authorized to review such information) without the Company's prior consent;

(b)    will maintain on the Company's behalf and surrender to the Company upon termination of the Employee's employment with the Company appropriate written records regarding all such items;

(c)    will, but without personal expense, fully cooperate with the Company, execute all papers and perform all acts requested by the Company to establish, confirm or protect its exclusive rights in such items or to enable it to transfer title to such items, together with any patents, copyrights, trademarks, service marks and/or trade names that may be applied for and/or issued;

(d)    will, but without personal expense, provide such information and true testimony as the Company may request regarding such items, including, without limitation, items which Employee neither conceived nor worked on but regarding which employee has knowledge because of Employee's employment by the Company;

(e)    hereby assigns to the Company, its successors and assigns, exclusive right, title and interest in and to all such items including, without limitation, any patents, copyrights, trademarks, service marks and/or trade names which have been, or may be, issued; and

(f)    states that the only such items in which Employee personally holds or claims an interest, and which are not subject to this Agreement, are listed on the Ownership Schedule attached hereto.  The absence of such an Ownership Schedule means that no such items exist.

6.    AMENDMENTS; TERMINATION.

(a)    The Company reserves the right to amend or modify this Agreement or the Sales Compensation Plan at any time after the date hereof.

(b)    Notwithstanding the foregoing, Employee understands and agrees that Employee is employed by the Company on an at-will basis.  As an at-will employee, Employee understands that either the Company or Employee can terminate the employment relationship at any time for any reason, with or without advance notice and with or without cause.  Employee further understands that, although over the course of Employee's employment, other terms and conditions of Employee's employment may change, the at-will term of Employee's employment will not change.  Employee understands that no one other than the Chief Executive Officer of the Company may enter into any agreement with Employee contrary to the foregoing and that any such contrary agreement must be in writing and signed by the Chief Executive Officer.

7.    GOVERNING LAW.  This Agreement shall be construed and interpreted in accordance with the laws of the State of New Jersey (where the Company's principal executive offices are located) applicable to contracts made and to be performed entirely within such State.  The courts of New Jersey and the United States District Court for New Jersey shall have jurisdiction over the parties with respect to any dispute or controversy between them arising under or in connection with this Agreement.  A summons or complaint in any such action or proceeding may be served by mail in accordance with Paragraph 8 below.

8.    NOTICES.  All notices shall be sent to the parties by certified or registered mail at the addresses set forth above or to any changed address which may be given in writing hereafter.  All notices to the Company shall include a copy to the Company at One ADP Boulevard, Roseland, New Jersey 07068, Attention: General Counsel.

9.    SEPARABILITY.  If any provision of this Agreement (including, but not limited to, any provision set forth in Paragraphs 4 and 5 above), or any portion thereof, is held to be invalid or unenforceable, the balance of the Agreement shall remain in effect, and if any provision is inapplicable to any person or circumstance it shall nevertheless remain applicable to all other persons and circumstances.

10.    TRANSFER OF EMPLOYMENT.  The parties recognize that Employee may be employed in offices of the Company other than the one in which Employee is currently employed hereunder.  Accordingly, the parties agree that whenever any event occurs affecting their respective rights, duties, or obligations hereunder, the member of the Company by which Employee is employed at the time such event occurs shall be deemed to be the "Company" for all purposes of this Agreement.

11.    HEADINGS.  The headings in this Agreement are solely for convenience of reference and shall not affect this Agreement's interpretation.

12.    ACKNOWLEDGMENTS.  Employee acknowledges that the information is confidential and proprietary information belonging to the Company and that the use or disclosure of the information except in connection with the Employee's employment with the Company could reduce that the Company's competitive advantage or otherwise commercially damage the Company.  Employee further acknowledges that the terms of this Agreement are reasonable and that Employee has had a reasonable opportunity to consult with an attorney before signing this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

Automatic Data Processing, Inc.

By: _____        4/10/07
                                              Date

_____             4/10/07
Employee                                      Date

**Automatic Data Processing, Inc.**
One ADP Boulevard
Roseland, New Jersey 07068

TO BE PREPARED AND
SIGNED IN DUPLICATE

For good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, I agree with you that

1.    (a) During and at any time after my employment with Automatic Data Processing, Inc. and/or any of its divisions, subsidiaries and affiliates (collectively "ADP"), I shall not use, or disclose to any person, corporation, partnership or other entity whatsoever any confidential information, trade secrets, and proprietary information of ADP, its vendors, licensors, marketing partners, or any of its clients (including, but not limited to, (i) ADP's business methods, procedures, pricing and marketing structure and strategy which are not publicly available and which I did not learn from a public source, (ii) ADP's source and object codes, computer screens, programs and forms, experimental or research work, methods, processes, formulas, or drawings, and (iii) the names, addresses and business activities of ADP's current, former and prospective clients, and/or ADP's and ADP's current, former, and prospective clients' employees) learned by me at any time during my employment with ADP.

(b) Upon ceasing to be an ADP employee, I shall immediately return all documents and notes (including all copies thereof) of any and all information and materials belonging or related to ADP (whether or not such materials were prepared by ADP, me or another person) and which are in my possession or over which I exercise any control.

(c) I agree that my violation of any provision of Paragraph 1(a) or 1(b) above will cause irreparable injury to ADP. Accordingly, ADP shall be entitled, in addition to any other rights and remedies it may have at law or in equity, to an injunction enjoining and restraining me from violating, or continuing to violate, any such provision.

2.    I understand and agree that ADP shall have exclusive rights to anything related to ADP's actual or prospective business which I conceive or work on while employed by ADP. Accordingly:

(a) I shall promptly and fully disclose all such items to ADP and will not disclose such items to any other person or entity (other than employees of ADP authorized to review such information), without ADP's prior consent;

(b) I shall maintain on ADP's behalf and surrender to ADP upon ceasing to be an ADP employee all written records regarding all such items;

(c) I shall, but without personal expense, fully cooperate with ADP and execute all papers and perform all acts requested by ADP to establish, confirm or protect its exclusive rights in such items or to enable it to transfer legal title to such items, together with any patents, copyrights, trademarks, service marks and/or trade names that may be applied for and/or issued;

(d) I shall, but without personal expense, provide such information and true testimony as ADP may request regarding such items including, without limitation, items which I neither conceived nor worked on but regarding which I have knowledge because of my employment by ADP; and

(e) I hereby assign to ADP, its successors and assigns, exclusive right, title and interest in and to all such items including, without limitation, any patents, copyrights, trademarks, service marks and/or trade names which have been, or may be, issued.

3.    I understand and agree that I am employed on an at-will basis. As an at-will employee, I understand and agree that either ADP or I can terminate our employment relationship at any time for any reason, with or without advance notice and with or without cause.   I understand and agree that, although over the course of my employment, other terms and conditions of my employment may change, the at-will term of my employment will not change.  I understand that no one other than the Chief Executive Officer of ADP may enter into any agreement with me contrary to the foregoing and that any such contrary agreement must be in writing and signed by the Chief Executive Officer.

4.    All notices shall be sent to the parties by certified or registered mail at the addresses set forth herein, Attention, in the case of ADP, Vice President, Human Resources, or to any changed address which may be given in writing hereafter.  All notices to ADP shall also include a copy to ADP at One ADP Boulevard, Roseland, New Jersey 07068, Attention: General Counsel.

5.    If any provision of this Agreement is held to be invalid or unenforceable, the balance of this Agreement shall remain in effect, and if any provision is inapplicable to any person or circumstance, it shall nevertheless remain applicable to all other persons and circumstances.

Very truly yours,

_____
(Signature of Employee)

Date: 05/29/07

ACCEPTED AND AGREED:
AUTOMATIC DATA PROCESSING, INC.

Name of Employee: CHASE AMUNDSIN
                                        (print or type)

_____
James B. Benson, Corporate Vice President

Address of Employee: 155 W. 96th St. Apt 2N
                                       (print or type)

9711(2-08)

© 1992, 1998 Automatic Data Processing, Inc.

[Award Acceptance Document 3 of 3]



September 24, 2009

Restrictive Covenant

In my position(s) as a Sales Compensated Associate with Automatic Data Processing, Inc., its subsidiaries and affiliates (collectively "ADP"), I have access to ADP's confidential information and trade secrets. I have previously entered into a Sales Representative Agreement with ADP.

I am interested in participating in ADP's 2008 Omnibus Award Plan (the "Plan"). In consideration of being granted an award under the Plan and for other good and valuable consideration, I agree as follows:

1.    During the twelve-month period following the date I cease to be an employee of ADP for any reason whatsoever (the "Non-Competition Period"), I will not, within any territory I managed or to which I was assigned or covered during the last twelve months of my employment with ADP, directly or indirectly, (i) become employed by or be associated with in any capacity, or (ii) perform any work within or on behalf of, any person, corporation, partnership or other entity whatsoever (a "Person") competing or potentially competing with ADP.

2.    During and after my employment by ADP, I will not use, or disclose to any Person any confidential information, trade secrets and proprietary information of ADP, its vendors, licensors, marketing partners or clients, learned by me during my employment and/or any of the names and addresses of clients of ADP. I acknowledge that I am prohibited from taking any confidential, proprietary or other materials or property of ADP with me upon termination of my employment. Upon termination of my employment, I shall return all ADP materials (including, without limitation, all memoranda and notes containing the names, addresses and needs of ADP clients and bona fide prospective clients) in my possession or over which I exercise control, regardless of whether such materials were prepared by ADP, me or a third party.

3.    During the Non-Competition Period, I shall not, on my behalf or on behalf of any other Person, directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Person which was a client or bona fide prospective client of ADP before the date I cease to be an ADP employee (the "Termination Date") to sell (license or lease) any software or service competitive or potentially competitive with any software or service sold, licensed, leased, provided or under development by ADP during the two-year period prior to the Termination Date, provided that the restrictions set forth in this paragraph 3 shall only apply to clients and bona fide prospective clients of businesses of ADP with which I was involved.

4.    During the Non-Competition Period, I will not, directly or indirectly, hire, contract with, solicit, or encourage to leave ADP's employ any ADP employee, or hire or contract with any former ADP employee within one year after the date such person ceases to be an ADP employee.

5.    During my employment by ADP, I shall not accept any position (unless such position is to commence after my employment ceases), gratuities, compensation, reimbursement or funds, or their equivalent, from any Person engaged in any business in which ADP is engaged.

6.    A violation of the foregoing covenants not to compete, not to disclose, not to solicit and not to hire will cause irreparable injury to ADP. ADP shall be entitled, in addition to any other rights and remedies it may have at law or in equity, to an injunction enjoining and restraining me from performing, and continuing in the performance of, any such violation.

7.    I understand and acknowledge that ADP shall have the sole and exclusive rights to anything

MI58302 (09-09) C – US          © 2009 Automatic Data Processing, Inc

relating to its actual or prospective business which I conceive or work on, either in whole or in part, while employed by ADP and that all such work product may be property of ADP as "works for hire" under federal copyright law and may also constitute ADP confidential and proprietary information. Accordingly, I:

(a)  will promptly and fully disclose all such items to ADP and will not disclose such items to any other person or entity without ADP's prior consent;

(b)  will maintain on ADP's behalf and surrender to ADP upon termination of my employment appropriate written records regarding all such items;

(c)  will, but without personal expense, fully cooperate with ADP, execute all papers and perform all acts requested by ADP to establish, confirm or protect its exclusive rights in such items or to enable it to transfer legal title to such items, together with any patents that may be issued;

(d)  will, but without personal expense, provide such information and true testimony as ADP may request regarding such items including, without limitation, items which I neither conceived nor worked on but regarding which I have knowledge because of my employment with ADP;

(e)  hereby assign to ADP, it successors and assigns, exclusive right, title and interest in and to all such items, including any patents which have been or may be issued; and

(f)  state that only such items in which I personally hold or claim an interest and which are not subject to this Agreement are listed on the Ownership Schedule attached hereto. The absence of an Ownership Schedule means that no such items exist.

8.    My obligations under this Agreement shall be binding upon me even if I manage, am assigned or cover territory other than the territory I currently manage, am assigned or cover regardless of which office(s) of ADP I am employed at or position(s) I hold. My obligations under this Agreement shall inure to the benefit of any successors or assigns of ADP. This Agreement supplements and does not supersede any prior agreement(s) on the subject matter addressed herein.

9.    If any provision of this Agreement is invalid or unenforceable, the balance of this Agreement shall remain in effect. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New Jersey. Any waiver of any provision of this Agreement shall be valid only if set forth in an instrument in writing signed by ADP. Any waiver of any provision shall not be construed as a subsequent waiver of the same provision, or a waiver of any other provision, of this Agreement. I acknowledge that the terms of this Agreement are reasonable and that I have had a reasonable opportunity to consult with an attorney before agreeing to the terms of this Agreement.

After reviewing this document close this window to continue the grant acceptance process.

Exhibit C

[Award Acceptance Document 3 of 3]



September 23, 2010

Restrictive Covenant

In my position(s) as a Sales Compensated Associate with Automatic Data Processing, Inc., its subsidiaries and affiliates (collectively "ADP"), I have access to ADP's confidential information and trade secrets. I have previously entered into a Sales Representative Agreement with ADP.

I am interested in participating in ADP's 2008 Omnibus Award Plan (the "Plan"). In consideration of being granted an award under the Plan and for other good and valuable consideration, I agree as follows:

1. During the twelve-month period following the date I cease to be an employee of ADP for any reason whatsoever (the "Non-Competition Period"), I will not, within any territory I managed or to which I was assigned or covered during the last twelve months of my employment with ADP, directly or indirectly, (i) become employed by or be associated with in any capacity, or (ii) perform any work within or on behalf of, any person, corporation, partnership or other entity whatsoever (a "Person") competing or potentially competing with ADP.

2. During and after my employment by ADP, I will not use, or disclose to any Person any confidential information, trade secrets and proprietary information of ADP, its vendors, licensors, marketing partners or clients, learned by me during my employment and/or any of the names and addresses of clients of ADP. I acknowledge that I am prohibited from taking any confidential, proprietary or other materials or property of ADP with me upon termination of my employment. Upon termination of my employment, I shall return all ADP materials (including, without limitation, all memoranda and notes containing the names, addresses and needs of ADP clients and bona fide prospective clients) in my possession or over which I exercise control, regardless of whether such materials were prepared by ADP, me or a third party.

3. During the Non-Competition Period, I shall not, on my behalf or on behalf of any other Person, directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Person which was a client or bona fide prospective client of ADP before the date I cease to be an ADP employee (the "Termination Date") to sell (license or lease) any software or service competitive or potentially competitive with any software or service sold, licensed, leased, provided or under development by ADP during the two-year period prior to the Termination Date, provided that the restrictions set forth in this paragraph 3 shall only apply to clients and bona fide prospective clients of businesses of ADP with which I was involved.

4. During the Non-Competition Period, I will not, directly or indirectly, hire, contract with, solicit, or encourage to leave ADP's employ any ADP employee, or hire or contract with any former ADP employee within one year after the date such person ceases to be an ADP employee.

5. During my employment by ADP, I shall not accept any position (unless such position is to commence after my employment ceases), gratuities, compensation, reimbursement or funds, or their equivalent, from any Person engaged in any business in which ADP is engaged.

6. A violation of the foregoing covenants not to compete, not to disclose, not to solicit and not to hire will cause irreparable injury to ADP. ADP shall be entitled, in addition to any other rights and remedies it may have at law or in equity, to an injunction enjoining and restraining me from performing, and continuing in the performance of, any such violation.

7. I understand and acknowledge that ADP shall have the sole and exclusive rights to anything

© 2010 Automatic Data Processing, Inc

relating to its actual or prospective business which I conceive or work on, either in whole or in part, while employed by ADP and that all such work product may be property of ADP as "works for hire" under federal copyright law and may also constitute ADP confidential and proprietary information. Accordingly, I:

      (a)  will promptly and fully disclose all such items to ADP and will not disclose such items to any other person or entity without ADP's prior consent;

      (b)  will maintain on ADP's behalf and surrender to ADP upon termination of my employment appropriate written records regarding all such items;

      (c)  will, but without personal expense, fully cooperate with ADP, execute all papers and perform all acts requested by ADP to establish, confirm or protect its exclusive rights in such items or to enable it to transfer legal title to such items, together with any patents that may be issued;

      (d)  will, but without personal expense, provide such information and true testimony as ADP may request regarding such items including, without limitation, items which I neither conceived nor worked on but regarding which I have knowledge because of my employment with ADP;

      (e)  hereby assign to ADP, it successors and assigns, exclusive right, title and interest in and to all such items, including any patents which have been or may be issued; and

      (f)  state that only such items in which I personally hold or claim an interest and which are not subject to this Agreement are listed on the Ownership Schedule attached hereto. The absence of an Ownership Schedule means that no such items exist.

    8.  My obligations under this Agreement shall be binding upon me even if I manage, am assigned or cover territory other than the territory I currently manage, am assigned or cover regardless of which office(s) of ADP I am employed at or position(s) I hold. My obligations under this Agreement shall inure to the benefit of any successors or assigns of ADP. This Agreement supplements and does not supersede any prior agreement(s) on the subject matter addressed herein.

    9.  If any provision of this Agreement is invalid or unenforceable, the balance of this Agreement shall remain in effect. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New Jersey. Any waiver of any provision of this Agreement shall be valid only if set forth in an instrument in writing signed by ADP. Any waiver of any provision shall not be construed as a subsequent waiver of the same provision, or a waiver of any other provision, of this Agreement. I acknowledge that the terms of this Agreement are reasonable and that I have had a reasonable opportunity to consult with an attorney before agreeing to the terms of this Agreement.

After reviewing this document close this window to continue the grant acceptance process.

Exhibit D

[Award Acceptance Document 3 of 3]



September 22, 2011

Restrictive Covenant

In my position(s) as a Sales Compensated Associate with Automatic Data Processing, Inc., its subsidiaries and affiliates (collectively "ADP"), I have access to ADP's confidential information and trade secrets. I have previously entered into a Sales Representative Agreement with ADP.

I am interested in participating in ADP's 2008 Omnibus Award Plan (the "Plan"). In consideration of being granted an award under the Plan and for other good and valuable consideration, I agree as follows:

1.    During the twelve-month period following the date I cease to be an employee of ADP for any reason whatsoever (the "Non-Competition Period"), I will not, within any territory I managed or to which I was assigned or covered during the last twelve months of my employment with ADP, directly or indirectly, (i) become employed by or be associated with in any capacity, or (ii) perform any work within or on behalf of, any person, corporation, partnership or other entity whatsoever (a "Person") competing or potentially competing with ADP.

2.    During and after my employment by ADP, I will not use, or disclose to any Person any confidential information, trade secrets and proprietary information of ADP, its vendors, licensors, marketing partners or clients, learned by me during my employment and/or any of the names and addresses of clients of ADP. I acknowledge that I am prohibited from taking any confidential, proprietary or other materials or property of ADP with me upon termination of my employment.  Upon termination of my employment, I shall return all ADP materials (including, without limitation, all memoranda and notes containing the names, addresses and needs of ADP clients and bona fide prospective clients) in my possession or over which I exercise control, regardless of whether such materials were prepared by ADP, me or a third party.

3.    During the Non-Competition Period, I shall not, on my behalf or on behalf of any other Person, directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Person which was a client or bona fide prospective client of ADP before the date I cease to be an ADP employee (the "Termination Date") to sell (license or lease) any software or service competitive or potentially competitive with any software or service sold, licensed, leased, provided or under development by ADP during the two-year period prior to the Termination Date, provided that the restrictions set forth in this paragraph 3 shall only apply to clients and bona fide prospective clients of businesses of ADP with which I was involved.

4.    During the Non-Competition Period, I will not, directly or indirectly, hire, contract with, solicit, or encourage to leave ADP's employ any ADP employee, or hire or contract with any former ADP employee within one year after the date such person ceases to be an ADP employee.

5.    During my employment by ADP, I shall not accept any position (unless such position is to commence after my employment ceases), gratuities, compensation, reimbursement or funds, or their equivalent, from any Person engaged in any business in which ADP is engaged.

6.    A violation of the foregoing covenants not to compete, not to disclose, not to solicit and not to hire will cause irreparable injury to ADP.  ADP shall be entitled, in addition to any other rights and remedies it may have at law or in equity, to an injunction enjoining and restraining me from performing, and continuing in the performance of, any such violation.

7.    I understand and acknowledge that ADP shall have the sole and exclusive rights to anything

© 2011 Automatic Data Processing, Inc

relating to its actual or prospective business which I conceive or work on, either in whole or in part, while employed by ADP and that all such work product may be property of ADP as "works for hire" under federal copyright law and may also constitute ADP confidential and proprietary information.  Accordingly, I:

(a) will promptly and fully disclose all such items to ADP and will not disclose such items to any other person or entity without ADP's prior consent;

(b) will maintain on ADP's behalf and surrender to ADP upon termination of my employment appropriate written records regarding all such items;

(c) will, but without personal expense, fully cooperate with ADP, execute all papers and perform all acts requested by ADP to establish, confirm or protect its exclusive rights in such items or to enable it to transfer legal title to such items, together with any patents that may be issued;

(d) will, but without personal expense, provide such information and true testimony as ADP may request regarding such items including, without limitation, items which I neither conceived nor worked on but regarding which I have knowledge because of my employment with ADP;

(e) hereby assign to ADP, it successors and assigns, exclusive right, title and interest in and to all such items, including any patents which have been or may be issued; and

(f) state that only such items in which I personally hold or claim an interest and which are not subject to this Agreement are listed on the Ownership Schedule attached hereto.  The absence of an Ownership Schedule means that no such items exist.

8.  My obligations under this Agreement shall be binding upon me even if I manage, am assigned or cover territory other than the territory I currently manage, am assigned or cover regardless of which office(s) of ADP I am employed at or position(s) I hold.  My obligations under this Agreement shall inure to the benefit of any successors or assigns of ADP.  This Agreement supplements and does not supersede any prior agreement(s) on the subject matter addressed herein.

9.  If any provision of this Agreement is invalid or unenforceable, the balance of this Agreement shall remain in effect.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New Jersey.  Any waiver of any provision of this Agreement shall be valid only if set forth in an instrument in writing signed by ADP.  Any waiver of any provision shall not be construed as a subsequent waiver of the same provision, or a waiver of any other provision, of this Agreement. I acknowledge that the terms of this Agreement are reasonable and that I have had a reasonable opportunity to consult with an attorney before agreeing to the terms of this Agreement.

After reviewing this document close this window to continue the grant acceptance process.

[Award Acceptance Document 3 of 3]



September 19, 2012

**Restrictive Covenant**

In my position(s) as a Sales Compensated Associate with Automatic Data Processing, Inc., its subsidiaries and affiliates (collectively "ADP"), I have access to ADP's confidential information and trade secrets. I have previously entered into a Sales Representative Agreement with ADP.

I am interested in participating in ADP's 2008 Omnibus Award Plan (the "Plan"). In consideration of being granted an award under the Plan and for other good and valuable consideration, I agree as follows:

1. During the twelve-month period following the date I cease to be an employee of ADP for any reason whatsoever (the "Non-Competition Period"), I will not, within any territory I managed or to which I was assigned or covered during the last twelve months of my employment with ADP, directly or indirectly, (i) become employed by or be associated with in any capacity, or (ii) perform any work within or on behalf of, any person, corporation, partnership or other entity whatsoever (a "Person") competing or potentially competing with ADP.

2. During and after my employment by ADP, I will not use, or disclose to any Person any confidential information, trade secrets and proprietary information of ADP, its vendors, licensors, marketing partners or clients, learned by me during my employment and/or any of the names and addresses of clients of ADP. I acknowledge that I am prohibited from taking any confidential, proprietary or other materials or property of ADP with me upon termination of my employment. Upon termination of my employment, I shall return all ADP materials (including, without limitation, all memoranda and notes containing the names, addresses and needs of ADP clients and bona fide prospective clients) in my possession or over which I exercise control, regardless of whether such materials were prepared by ADP, me or a third party.

3. During the Non-Competition Period, I shall not, on my behalf or on behalf of any other Person, directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Person which was a client or bona fide prospective client of ADP before the date I cease to be an ADP employee (the "Termination Date") to sell (license or lease) any software or service competitive or potentially competitive with any software or service sold, licensed, leased, provided or under development by ADP during the two-year period prior to the Termination Date, provided that the restrictions set forth in this paragraph 3 shall only apply to clients and bona fide prospective clients of businesses of ADP with which I was involved.

4. During the Non-Competition Period, I will not, directly or indirectly, hire, contract with, solicit, or encourage to leave ADP's employ any ADP employee, or hire or contract with any former ADP employee within one year after the date such person ceases to be an ADP employee.

5. During my employment by ADP, I shall not accept any position (unless such position is to commence after my employment ceases), gratuities, compensation, reimbursement or funds, or their equivalent, from any Person engaged in any business in which ADP is engaged.

6. A violation of the foregoing covenants not to compete, not to disclose, not to solicit and not to hire will cause irreparable injury to ADP. ADP shall be entitled, in addition to any other rights and remedies it may have at law or in equity, to an injunction enjoining and restraining me from performing, and continuing in the performance of, any such violation.

7. I understand and acknowledge that ADP shall have the sole and exclusive rights to anything relating to its actual or prospective business which I conceive or work on, either in whole or in part, while employed by ADP and that all such work product may be property of ADP as "works for hire" under federal copyright law and may also constitute ADP confidential and proprietary information. Accordingly, I:

(a) will promptly and fully disclose all such items to ADP and will not disclose such items to any other person or entity without ADP's prior consent;

(b) will maintain on ADP's behalf and surrender to ADP upon termination of my employment appropriate written records regarding all such items;

© 2012 Automatic Data Processing, Inc

(c) will, but without personal expense, fully cooperate with ADP, execute all papers and perform all acts requested by ADP to establish, confirm or protect its exclusive rights in such items or to enable it to transfer legal title to such items, together with any patents that may be issued;

(d) will, but without personal expense, provide such information and true testimony as ADP may request regarding such items including, without limitation, items which I neither conceived nor worked on but regarding which I have knowledge because of my employment with ADP;

(e) hereby assign to ADP, it successors and assigns, exclusive right, title and interest in and to all such items, including any patents which have been or may be issued; and

(f) state that only such items in which I personally hold or claim an interest and which are not subject to this Agreement are listed on the Ownership Schedule attached hereto. The absence of an Ownership Schedule means that no such items exist.

8. My obligations under this Agreement shall be binding upon me even if I manage, am assigned or cover territory other than the territory I currently manage, am assigned or cover regardless of which office(s) of ADP I am employed at or position(s) I hold. My obligations under this Agreement shall inure to the benefit of any successors or assigns of ADP. This Agreement supplements and does not supersede any prior agreement(s) on the subject matter addressed herein.

9. If any provision of this Agreement is invalid or unenforceable, the balance of this Agreement shall remain in effect. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New Jersey. Any waiver of any provision of this Agreement shall be valid only if set forth in an instrument in writing signed by ADP. Any waiver of any provision shall not be construed as a subsequent waiver of the same provision, or a waiver of any other provision, of this Agreement. I acknowledge that the terms of this Agreement are reasonable and that I have had a reasonable opportunity to consult with an attorney before agreeing to the terms of this Agreement.

After reviewing this document close this window to continue the grant acceptance process.

© 2012 Automatic Data Processing, Inc

[Award Acceptance Document 3 of 3]



September 3, 2013

## RESTRICTIVE COVENANT

I am currently employed by Automatic Data Processing, Inc., or one of its subsidiaries or affiliated companies (collectively, "ADP") as a Sales Compensated Associate who enjoys substantial compensation and benefits from ADP, including participation in its 2008 Omnibus Award Plan, and as an ADP employee, I have had and will have access to ADP's Confidential Information, proprietary information, and trade secrets about ADP's operations, systems, techniques, software, and processes, its Clients, Business Partners, Vendors, and other unique trade and business methods, all of which are valuable assets of ADP that are developed at great effort and expense to ADP. I also have had or will have significant contact with ADP's current and prospective Clients, Business Partners, and/or Vendors in order to develop ADP's goodwill and client relations so that I can promote ADP's interests and objectives, and I understand that ADP has invested and will invest a significant amount of time and financial resources to develop my skills to assist me in performing my job duties for ADP.

I understand that ADP is a profit-generating business operating in a highly competitive business environment and that it has a valid interest in protecting its valuable assets, including its Confidential Information, proprietary information and trade secrets, its goodwill and business relationships with its Clients, Vendors, and employees, the specialized training of its employees, and I recognize that my use of ADP's valuable assets, directly or indirectly, against or in competition with ADP, during and after my employment, will result in irreparable harm to ADP. Accordingly, I understand that this Agreement is meant to limit reasonably and fairly my competition during employment and following the end of my employment, and to define the corresponding obligations between me and ADP regarding: (1) unfair competition, (2) the solicitation of Clients for or on behalf of ADP's competitors, (3) the solicitation of ADP's employees, and (4) the treatment of ADP's proprietary information, Confidential Information, and trade secrets.

NOW, THEREFORE, in consideration of my initial or continuing employment with ADP, ADP's disclosure to me of its proprietary information, Confidential Information, and trade secrets to allow me to perform my duties for ADP, my inclusion in ADP's 2008 Omnibus Award Plan, the mutual benefits conferred herein, and for other good and valuable consideration (the receipt and sufficiency of all of which I hereby acknowledge), I agree as follows:

1. **Definitions.**

   a.    **"Business of ADP"** ADP is a global provider of (i) business outsourcing and human capital management solutions, including, without limitation, human resource, payroll, time, attendance and labor management, pre-employment, talent management, compliance and payment solutions, tax and benefits and retirement administration solutions and employment administration outsourcing solutions, (ii) practice management and electronic health records software to medical service providers and other third parties, and outsourced medical billing solutions, and (iii) technology based solutions and other products and services (including, without limitation, integrated dealer management systems, digital marketing solutions and other business management solutions) to auto, truck, motorcycle, marine, recreational vehicle, heavy equipment, and other motor vehicle manufacturers, distributors, and retailers. ADP also provides workers compensation and health insurance in the United States and Canada through its licensed insurance agencies and consulting services relating to its business outsourcing and human capital management solutions. ADP also provides data-driven business intelligence on issues in human capital management, employment, and workforce trends.

   b.    **"Business Partners"** means any individual, corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is or has been in a commercial or business relationship with ADP (excluding Clients and Vendors), including, without limitation, (i) referral partners, resellers, brokers, distributors, licensees, franchisees and marketing partners, (ii) implementation, integration and

MI58382 (09-13)                              © 2013 Automatic Data Processing, Inc

development partners, (iii) co-investors and joint venture partners, and (iv) any other individual or entity whose products or services ADP purchases, acquires or licenses for use with, or redistribution to, a third party (including Clients).

c.  "Clients" means any individual, corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, or government entity for whom ADP provided or provides products or services in connection with the Business of ADP or whom ADP has actively solicited in connection with the Business of ADP.

d.  "Competing Business" means any individual (including me), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is engaged in any business or enterprise that is the same as, or substantially the same as, the Business of ADP for that part of the business in which I have worked or to which I have been exposed during my employment with ADP (regardless of whether I worked only for a particular segment of that part of the business in which I worked—for example, business segments based on the number of employees a Client has or a particular class of business using an ADP product or service).

e.  "Confidential Information" means information and the compilation of information known by me because of my employment at ADP that is created, compiled, or gathered by ADP or its agents and is related to the Business of ADP, that is valuable to ADP, and which ADP endeavors to protect from disclosure or use by its competitors and others who could benefit from its use. Assuming the foregoing criteria are met, Confidential Information includes but is not limited to information about: ADP's operations, products, and services; research and development of ADP products and services; ADP's intellectual property; Creative Works, including all publications, products, applications, processes, and software in any stage of development; names and other listings of current or prospective Clients, Business Partners, and Vendors (including contact information that may be compiled in computer databases that are not owned or controlled by ADP such as address books, personal digital assistants, smart phones, and social and business websites); proposals made to current or prospective Clients, Business Partners, and Vendors or other information contained in offers or proposals to such Clients, Business Partners, and Vendors; the terms of any arrangements or agreements with Clients, Business Partners, and Vendors, including the amounts paid for such services or how pricing was developed by ADP, the implementation of Client-specific projects, the identity of Business Partners and Vendors, and Business Partner and Vendor pricing information, the composition or description of future services that are or may be provided by ADP; ADP's financial, marketing, and sales information; and technical expertise and know-how developed by ADP, including the unique manner in which ADP conducts its business. Confidential Information shall also include any information disclosed to ADP by a third party (including, without limitation, current or prospective Clients, Business Partners, and Vendors) which I understand that ADP is reasonably obliged to treat as confidential. This definition of Confidential Information excludes information that is or becomes known or generally available in the public domain other than through my act or failure to act. This definition of Confidential Information and the use of the term Confidential Information in this Agreement are not meant to limit ADP's rights under applicable trade secrets laws, and ADP specifically reserves all of its rights under all applicable laws concerning trade secrets.

f.  "Creative Works" means any and all works of authorship including, for example, written documents, spreadsheets, graphics, designs, trademarks, service marks, algorithms, computer programs or code, protocols, formulas, mask works, brochures, presentations, photographs, music or compositions, manuals, reports, and compilations of various elements, whether or not patentable or registrable under copyright, trademark, or similar domestic and international laws.

g.  "Material Business Contact" means contact that is intended to establish or strengthen a business relationship for ADP.

h.  "Territory" means the geographic area where I worked, represented ADP, or had Material Business Contact with ADP's Clients in the two (2) year period preceding the termination of my employment with ADP.

i.       "Vendors" means any individual, corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, or government entity that supplies materials or services to ADP for internal use.

2.       **Duties and Best Efforts.**  I agree to provide to ADP and its Clients services related to the Business of ADP, as directed by ADP in its sole discretion.  During employment, I agree to devote my full time and best efforts to ADP, not to provide to ADP's Clients or ADP's competitors the same or similar services or products as those provided to ADP other than on behalf of ADP, and not to engage in any other employment, consultant, or advisory relationship that is the same as, similar to, or related to my duties with ADP or the Business of ADP or that otherwise creates a conflict of interest with ADP.  I also agree that I am prohibited from accessing any of ADP's computer systems, servers, drives, or databases for any competitive or conflicting purpose and that any authorization for such access is revoked and prohibited by ADP once I engage in any competitive or conflicting activities or take any material steps towards accomplishing any competitive or conflicting activities.

3.       **Non-Competition.**  I agree that during my employment and for a period of twelve (12) months from the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, directly or indirectly, own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business anywhere in the Territory where doing so will require me to (i) provide the same or substantially similar services to a Competing Business as those which I provided to ADP while employed, or (ii) use or disclose ADP's trade secrets.  However, after my voluntary or involuntary termination of my employment for any reason and with or without cause, nothing shall prevent me from owning, as an inactive investor, securities of any competitor of ADP which is listed on a national securities exchange.

4.       **Non-Solicitation of and Non-Interference with Clients, Business Partners, and Vendors.**

a.       **Clients:**  I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly, solicit, divert, appropriate, or accept any business from, or attempt to solicit, divert, appropriate, or accept any business from any Client for the purposes of providing products or services that are the same as or substantially similar to those provided in the Business of ADP, for any Client: (i) whom ADP provides products or services in connection with the Business of ADP; (ii) whom ADP has provided products or services in connection with the Business of ADP and with whom ADP reasonably expects business within the two (2) year period following my termination of employment from ADP; (iii) whom ADP has actively solicited in connection with the Business of ADP within the two (2) year period prior to my termination of employment from ADP; or (iv) about whom I have any trade secret information.  I also agree that I will not wrongfully induce or encourage or attempt to wrongfully induce or encourage any Clients to cease doing business with ADP or materially alter their business relationship with ADP.

b.       **Business Partners:**  I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly engage, contract with, solicit, divert, appropriate or accept any business from, or attempt to engage, contract with, solicit, divert, appropriate or accept any business from any Business Partner to provide to me or any Competing Business any product or service that is (a) the same as or substantially similar to the product or service provided to ADP and which ADP uses for, uses for obtaining, or distributes to, its Clients or (b) specialized, customized or designed by the Business Partner for ADP.  This provision applies only to any Business Partner: (i) whom ADP currently has a commercial or business relationship with ADP in connection with the Business of ADP; (ii) whom ADP has had a commercial or business relationship in connection with the Business of ADP and with whom ADP reasonably expects business within the two (2) year period following my termination of employment from ADP; (iii) whom ADP has actively solicited for a commercial or business relationship in connection with the Business of ADP within the two (2) year period prior to my termination of employment from ADP; or (iv) about whom I have any trade secret information.  I also agree that I will not wrongfully induce or encourage or attempt to wrongfully induce or encourage any Business Partner to cease doing business with ADP or materially alter their business relationship with ADP.

c.       **Vendors:**  I agree that I will not wrongfully induce or encourage or attempt to wrongfully induce or encourage any Vendor to cease doing business with ADP or materially alter their business relationship with ADP.

5.    **Non-Solicitation of Employees.** I agree that during my employment with ADP and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, directly or indirectly, hire, solicit, recruit, or encourage to leave ADP, any current employees of ADP or hire, solicit, recruit, or contract with employees who terminate their employment with ADP within twelve (12) months following my termination date.

6.    **Non-Disclosure and Non-Use of Confidential Information and Trade Secrets.** During my employment, except as authorized and required to perform my duties for ADP, and after the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not disclose, use, reproduce, distribute, or otherwise disseminate ADP's Confidential Information or trade secrets or take any action causing, or fail to take any action necessary, in order to prevent any such information to lose its character or cease to qualify as Confidential Information or a trade secret. I agree to inquire with ADP if I have any questions about whether particular information is Confidential Information or a trade secret before using or disclosing such information. I also agree to immediately return to ADP all property belonging to ADP such as keys, credit cards, telephones, tools, equipment, computers, and electronic storage devices, as well as all originals, copies, or other physical embodiments of ADP's Confidential Information or trade secrets (regardless of whether it is in paper, electronic, or other form), including any such information in any programs, business forms, manuals, correspondence, files, databases, or on computer disks or any other storage medium, whether or not owned or controlled by me or ADP (e.g., social and business networking websites, web-based email servers, or cloud storage services), immediately upon termination of my employment or upon any earlier request by ADP, and I agree not to keep or distribute any copies, electronic or otherwise, of any of the foregoing. I also understand that my obligations under this paragraph, as well as the other covenants in this Agreement, extend to my activities on the Internet, including my use of business oriented social networking sites such as LinkedIn and Facebook.

7.    **Prior Agreements and Disclosure of Agreement to Third Parties.** I represent that I am not a party to any agreement with any former employer or any other person or entity containing any non-disclosure, non-compete, non-solicitation, non-recruitment, intellectual property assignment, or other covenants that will affect my ability to devote my full time and attention to the Business of ADP that has not already been disclosed to ADP in writing. I also agree to provide a copy of this Agreement to any subsequent employer, person, or entity to which I intend to provide services that may conflict with any of my obligations in this Agreement prior to engaging in any such activities and to provide ADP in writing the name and address of any such employer, person, or entity and a description of the services I intend to provide prior to engaging in any such activities. I agree that ADP may also provide a copy of this Agreement or a description of its terms to any Client, subsequent employer, or other third party at any time as it deems necessary to protect its interests, and I agree to indemnify ADP against any claims and hold ADP harmless from any losses, costs, fees, expenses, and damages arising out of my failure to comply with this paragraph.

8.    **Severability and Reformation.** I agree if any particular paragraph, subparagraph, phrase, word, or other portion of this Agreement is determined by an appropriate court to be invalid or unenforceable as written, it shall be modified as necessary to be made valid or enforceable, and such modification shall not affect the remaining provisions of this Agreement, or if it cannot be modified to be made valid or enforceable, then it shall be severed from this Agreement, and all remaining terms and provisions shall remain enforceable.

9.    **Choice of Law, Venue, and Jurisdiction.** The interpretation, validity, and enforcement of this Agreement will be governed by the laws of the State of New Jersey, without regard to any conflicts of law principles that require the application of the law of another jurisdiction. I agree that any action by me to challenge the enforceability of this Agreement must be brought or litigated exclusively in the appropriate state or federal court located in the State of New Jersey. I also agree that any action by ADP to enforce this Agreement, as well as any related disputes or litigation related to this Agreement, may, but do not have to, be brought in the appropriate state or federal court located in the State of New Jersey. I agree and consent to the personal jurisdiction and venue of the federal or state courts of New Jersey for resolution of any disputes or litigation arising under or in connection with this Agreement or any challenge to this Agreement and waive any objections or defenses to personal jurisdiction or venue in any such proceeding before any such court.

10.     Survival.  All non-competition, non-solicitation, non-disclosure and non-use, non-recruiting, intellectual property, and Agreement disclosure obligations under paragraphs three (3) through seven (7) of this Agreement shall survive the voluntary or involuntary termination of my employment for any reason and with or without cause, and no dispute regarding any other provisions of this Agreement or regarding my employment or the termination of my employment shall prevent the operation and enforcement of these obligations.

11.     Relief, Remedies, and Enforcement.  I acknowledge that ADP is engaged in a highly competitive business, and the covenants and restrictions contained in this Agreement, including the geographic and temporal restrictions, are reasonably designed to protect ADP's legitimate business interests, including ADP goodwill and client relations, Confidential Information and trade secrets, and the specialized skills and knowledge gained by me and ADP's other employees during our employment.  I acknowledge and agree that a breach of any provision of this Agreement by me will cause serious and irreparable damage to ADP that will be difficult to quantify and for which a remedy at law for monetary damages alone may not be adequate.  Accordingly, I agree that if ADP should bring an action to enforce its rights under this Agreement and ADP establishes that I have breached or threatened to breach any of my obligations under this Agreement, ADP shall be entitled to injunctive relief.  I also agree that nothing in this Agreement shall be construed to prohibit ADP from pursuing any and all other legal or equitable remedies available to it, for breach of any of the provisions of this Agreement, including the disgorgement of any profits, commissions, or fees realized by me, any subsequent employers, any business owned or operated by me, or any of my agents, heirs, or assigns.  I agree that if ADP substantially prevails in any litigation arising out of or relating to this Agreement (including, without limitation, paragraph nine (9) above), ADP shall be entitled to recovery of its reasonable attorneys' fees and associated costs, in addition to any other relief mentioned above.  I also agree that that the knowledge, skills, and abilities I possess at the time of commencement of my employment are sufficient to permit me to earn a livelihood satisfactory to me without violating any provision of paragraphs three (3) through seven (7) above, for example, by using such knowledge, skills, and abilities, or some of them, in the service of business that is not competitive with ADP.

12.     Tolling.  The restricted time periods in paragraphs three (3) through six (6) above shall be tolled during any time period that I am in violation of such covenants, as determined by a court of competent jurisdiction, so that ADP may realize the full benefit of its bargain.  This tolling shall include any time period during which litigation is pending, but during which I have continued to violate such protective covenants and a court has declined to enjoin such conduct or I have failed to comply with any such injunction.

13.     Entire Agreement and Validity of Terms.  I agree that I do not rely, and have not relied, upon any representation or statement not set forth herein by ADP or any of ADP's agents, representatives, or attorneys, and that this Agreement may be changed only by a subsequent agreement in writing signed by both parties.  I understand that I may have an existing agreement(s) with ADP, through acquisition of a prior employer or otherwise, that may include the same or similar covenants as those in this Agreement, and acknowledge that this Agreement is meant to supplement any such agreement(s) such that the covenants in the agreements that provide ADP with the greatest protection enforceable under applicable law shall control, and that the parties do not intend to create any ambiguity or conflict through the execution of this Agreement that would release me from the obligations I have assumed under the protective covenants in any of these agreements.

14.     Electronic Signature.  I agree that ADP may enforce this Agreement with a copy for which I have provided an electronic signature.

15.     Assignment and Successorship.  This Agreement and ADP's rights and obligations hereunder may be assigned by ADP and shall inure to the benefit of and shall be enforceable by any such assignee, as well as any of ADP's successors in interest.  This Agreement and my rights and obligations may not be assigned by me, but are binding upon my heirs, administrators, executors, and personal representatives.

16.     Waiver.  The waiver by ADP of any breach of this Agreement by me shall not be effective unless in writing signed by the President of ADP, and no such waiver with regards to me or any other person under a similar agreement shall operate or be construed as a waiver of the same type of breach or any other breach on a subsequent occasion by me or any other person or entity.

MI58382 (09-13)                                      © 2013 Automatic Data Processing, Inc

5

17.     Legal Counsel.  I agree that I have read this Agreement before signing it, understand its terms, and that I have had the opportunity to have legal counsel review this agreement, prior to signing it, and I acknowledge that I have not been forced or coerced in any manner to sign this Agreement and do so of my own free will.

After reviewing this document close this window to continue the grant acceptance process.

[Award Acceptance Document 2 of 2]



September 2, 2014

## RESTRICTIVE COVENANT

I am currently employed by Automatic Data Processing, Inc., or one of its subsidiaries or affiliated companies (collectively, "ADP") as a Sales Compensated Associate who enjoys substantial compensation and benefits from ADP, including participation in its 2008 Omnibus Award Plan, and as an ADP employee, I have had and will have access to ADP's Confidential Information, proprietary information, and trade secrets about ADP's operations, systems, techniques, software, and processes, its Clients, Business Partners, Vendors, and other unique trade and business methods, all of which are valuable assets of ADP that are developed at great effort and expense to ADP. I also have had or will have significant contact with ADP's current and prospective Clients, Business Partners, and/or Vendors in order to develop ADP's goodwill and client relations so that I can promote ADP's interests and objectives, and I understand that ADP has invested and will invest a significant amount of time and financial resources to develop my skills to assist me in performing my job duties for ADP.

I understand that ADP is a profit-generating business operating in a highly competitive business environment and that it has a valid interest in protecting its valuable assets, including its Confidential Information, proprietary information and trade secrets, its goodwill and business relationships with its Clients, Vendors, and employees, the specialized training of its employees, and I recognize that my use of ADP's valuable assets, directly or indirectly, against or in competition with ADP, during and after my employment, will result in irreparable harm to ADP. Accordingly, I understand that this Agreement is meant to limit reasonably and fairly my competition during employment and following the end of my employment, and to define the corresponding obligations between me and ADP regarding: (1) unfair competition, (2) the solicitation of Clients for or on behalf of ADP's competitors, (3) the solicitation of ADP's employees, and (4) the treatment of ADP's proprietary information, Confidential Information, and trade secrets.

NOW, THEREFORE, in consideration of my initial or continuing employment with ADP, ADP's disclosure to me of its proprietary information, Confidential Information, and trade secrets to allow me to perform my duties for ADP, my inclusion in ADP's 2008 Omnibus Award Plan, the mutual benefits conferred herein, and for other good and valuable consideration (the receipt and sufficiency of all of which I hereby acknowledge), I agree as follows:

1.   **Definitions.**

   a.   **"Business of ADP"** ADP is a global provider of (i) business outsourcing and human capital management solutions, including, without limitation, human resource, payroll, time, attendance and labor management, pre-employment, talent management, compliance and payment solutions, tax and benefits and retirement administration solutions and employment administration outsourcing solutions, (ii) practice management and electronic health records software to medical service providers and other third parties, and outsourced medical billing solutions, and (iii) technology based solutions and other products and services (including, without limitation, integrated dealer management systems, digital marketing solutions and other business management solutions) to auto, truck, motorcycle, marine, recreational vehicle, heavy equipment, and other motor vehicle manufacturers, distributors, and retailers. ADP also provides workers compensation and health insurance in the United States and Canada through its licensed insurance agencies and consulting services relating to its business outsourcing and human capital management solutions. ADP also provides data-driven business intelligence on issues in human capital management, employment, and workforce trends.

   b.   **"Business Partners"** means any individual, corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is or has been in a commercial or business relationship with ADP (excluding Clients and Vendors), including, without limitation, (i) referral partners, resellers, brokers, distributors, licensees, franchisees and marketing partners, (ii) implementation, integration and

© 2014 Automatic Data Processing, Inc

development partners, (iii) co-investors and joint venture partners, and (iv) any other individual or entity whose products or services ADP purchases, acquires or licenses for use with, or redistribution to, a third party (including Clients).

c. "Clients" means any individual, corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, or government entity for whom ADP provided or provides products or services in connection with the Business of ADP or whom ADP has actively solicited in connection with the Business of ADP.

d. "Competing Business" means any individual (including me), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is engaged in any business or enterprise that is the same as, or substantially the same as, the Business of ADP for that part of the business in which I have worked or to which I have been exposed during my employment with ADP (regardless of whether I worked only for a particular segment of that part of the business in which I worked—for example, business segments based on the number of employees a Client has or a particular class of business using an ADP product or service).

e. "Confidential Information" means information and the compilation of information known by me because of my employment at ADP that is created, compiled, or gathered by ADP or its agents and is related to the Business of ADP, that is valuable to ADP, and which ADP endeavors to protect from disclosure or use by its competitors and others who could benefit from its use. Assuming the foregoing criteria are met, Confidential Information includes but is not limited to information about: ADP's operations, products, and services; research and development of ADP products and services; ADP's intellectual property; Creative Works, including all publications, products, applications, processes, and software in any stage of development; names and other listings of current or prospective Clients, Business Partners, and Vendors (including contact information that may be compiled in computer databases that are not owned or controlled by ADP such as address books, personal digital assistants, smart phones, and social and business websites); proposals made to current or prospective Clients, Business Partners, and Vendors or other information contained in offers or proposals to such Clients, Business Partners, and Vendors; the terms of any arrangements or agreements with Clients, Business Partners, and Vendors, including the amounts paid for such services or how pricing was developed by ADP, the implementation of Client-specific projects, the identity of Business Partners and Vendors, and Business Partner and Vendor pricing information, the composition or description of future services that are or may be provided by ADP; ADP's financial, marketing, and sales information; and technical expertise and know-how developed by ADP, including the unique manner in which ADP conducts its business. Confidential Information shall also include any information disclosed to ADP by a third party (including, without limitation, current or prospective Clients, Business Partners, and Vendors) which I understand that ADP is reasonably obliged to treat as confidential. This definition of Confidential Information excludes information that is or becomes known or generally available in the public domain other than through my act or failure to act. This definition of Confidential Information and the use of the term Confidential Information in this Agreement are not meant to limit ADP's rights under applicable trade secrets laws, and ADP specifically reserves all of its rights under all applicable laws concerning trade secrets.

f. "Creative Works" means any and all works of authorship including, for example, written documents, spreadsheets, graphics, designs, trademarks, service marks, algorithms, computer programs or code, protocols, formulas, mask works, brochures, presentations, photographs, music or compositions, manuals, reports, and compilations of various elements, whether or not patentable or registrable under copyright, trademark, or similar domestic and international laws.

g. "Material Business Contact" means contact that is intended to establish or strengthen a business relationship for ADP.

h. "Territory" means the geographic area where I worked, represented ADP, or had Material Business Contact with ADP's Clients in the two (2) year period preceding the termination of my employment with ADP.

2

© 2014 Automatic Data Processing, Inc

l.        "Vendors" means any individual, corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, or government entity that supplies materials or services to ADP for internal use.

2.        **Duties and Best Efforts.**  I agree to provide to ADP and its Clients services related to the Business of ADP, as directed by ADP in its sole discretion.  During employment, I agree to devote my full time and best efforts to ADP, not to provide to ADP's Clients or ADP's competitors the same or similar services or products as those provided to ADP other than on behalf of ADP, and not to engage in any other employment, consultant, or advisory relationship that is the same as, similar to, or related to my duties with ADP or the Business of ADP or that otherwise creates a conflict of interest with ADP.  I also agree that I am prohibited from accessing any of ADP's computer systems, servers, drives, or databases for any competitive or conflicting purpose and that any authorization for such access is revoked and prohibited by ADP once I engage in any competitive or conflicting activities or take any material steps towards accomplishing any competitive or conflicting activities.

3.        **Non-Competition.**  I agree that during my employment and for a period of twelve (12) months from the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, directly or indirectly, own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business anywhere in the Territory where doing so will require me to (i) provide the same or substantially similar services to a Competing Business as those which I provided to ADP while employed, or (ii) use or disclose ADP's trade secrets.  However, after my voluntary or involuntary termination of my employment for any reason and with or without cause, nothing shall prevent me from owning, as an inactive investor, securities of any competitor of ADP which is listed on a national securities exchange.

4.        **Non-Solicitation of and Non-Interference with Clients, Business Partners, and Vendors.**

a.        **Clients:**  I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly, solicit, divert, appropriate, or accept any business from, or attempt to solicit, divert, appropriate, or accept any business from any Client for the purposes of providing products or services that are the same as or substantially similar to those provided in the Business of ADP, for any Client: (i) whom ADP provides products or services in connection with the Business of ADP; (ii) whom ADP has provided products or services in connection with the Business of ADP and with whom ADP reasonably expects business within the two (2) year period following my termination of employment from ADP; (iii) whom ADP has actively solicited in connection with the Business of ADP within the two (2) year period prior to my termination of employment from ADP; or (iv) about whom I have any trade secret information.  I also agree that I will not wrongfully induce or encourage or attempt to wrongfully induce or encourage any Clients to cease doing business with ADP or materially alter their business relationship with ADP.

b.        **Business Partners:**  I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly engage, contract with, solicit, divert, appropriate or accept any business from, or attempt to engage, contract with, solicit, divert, appropriate or accept any business from any Business Partner to provide to me or any Competing Business any product or service that is (a) the same as or substantially similar to the product or service provided to ADP and which ADP uses for, uses for obtaining, or distributes to, its Clients or (b) specialized, customized or designed by the Business Partner for ADP.  This provision applies only to any Business Partner: (i) whom ADP currently has a commercial or business relationship with ADP in connection with the Business of ADP; (ii) whom ADP has had a commercial or business relationship in connection with the Business of ADP and with whom ADP reasonably expects business within the two (2) year period following my termination of employment from ADP; (iii) whom ADP has actively solicited for a commercial or business relationship in connection with the Business of ADP within the two (2) year period prior to my termination of employment from ADP; or (iv) about whom I have any trade secret information.  I also agree that I will not wrongfully induce or encourage or attempt to wrongfully induce or encourage any Business Partner to cease doing business with ADP or materially alter their business relationship with ADP.

c.        **Vendors:**  I agree that I will not wrongfully induce or encourage or attempt to wrongfully induce or encourage any Vendor to cease doing business with ADP or materially alter their business relationship with ADP.

5.      **Non-Solicitation of Employees.**  I agree that during my employment with ADP and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, directly or indirectly, hire, solicit, recruit, or encourage to leave ADP, any current employees of ADP or hire, solicit, recruit, or contract with employees who terminate their employment with ADP within twelve (12) months following my termination date.

6.      **Non-Disclosure and Non-Use of Confidential Information and Trade Secrets.**  During my employment, except as authorized and required to perform my duties for ADP, and after the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not disclose, use, reproduce, distribute, or otherwise disseminate ADP's Confidential Information or trade secrets or take any action causing, or fail to take any action necessary, in order to prevent any such Information to lose its character or cease to qualify as Confidential Information or a trade secret.  I agree to inquire with ADP if I have any questions about whether particular information is Confidential Information or a trade secret before using or disclosing such Information.  I also agree to immediately return to ADP all property belonging to ADP such as keys, credit cards, telephones, tools, equipment, computers, and electronic storage devices, as well as all originals, copies, or other physical embodiments of ADP's Confidential Information or trade secrets (regardless of whether it is in paper, electronic, or other form), including any such information in any programs, business forms, manuals, correspondence, files, databases, or on computer disks or any other storage medium, whether or not owned or controlled by me or ADP (e.g., social and business networking websites, web-based email servers, or cloud storage services), immediately upon termination of my employment or upon any earlier request by ADP, and I agree not to keep or distribute any copies, electronic or otherwise, of any of the foregoing.  I also understand that my obligations under this paragraph, as well as the other covenants in this Agreement, extend to my activities on the Internet, including my use of business oriented social networking sites such as LinkedIn and Facebook.

7.      **Prior Agreements and Disclosure of Agreement to Third Parties.**  I represent that I am not a party to any agreement with any former employer or any other person or entity containing any non-disclosure, non-compete, non-solicitation, non-recruitment, intellectual property assignment, or other covenants that will affect my ability to devote my full time and attention to the Business of ADP that has not already been disclosed to ADP in writing.  I also agree to provide a copy of this Agreement to any subsequent employer, person, or entity to which I intend to provide services that may conflict with any of my obligations in this Agreement prior to engaging in any such activities and to provide ADP in writing the name and address of any such employer, person, or entity and a description of the services I intend to provide prior to engaging in any such activities.  I agree that ADP may also provide a copy of this Agreement or a description of its terms to any Client, subsequent employer, or other third party at any time as it deems necessary to protect its interests, and I agree to indemnify ADP against any claims and hold ADP harmless from any losses, costs, fees, expenses, and damages arising out of my failure to comply with this paragraph.

8.      **Severability and Reformation.**  I agree if any particular paragraph, subparagraph, phrase, word, or other portion of this Agreement is determined by an appropriate court to be invalid or unenforceable as written, it shall be modified as necessary to be made valid or enforceable, and such modification shall not affect the remaining provisions of this Agreement, or if it cannot be modified to be made valid or enforceable, then it shall be severed from this Agreement, and all remaining terms and provisions shall remain enforceable.

9.      **Choice of Law, Venue, and Jurisdiction.**  The interpretation, validity, and enforcement of this Agreement will be governed by the laws of the State of New Jersey, without regard to any conflicts of law principles that require the application of the law of another jurisdiction.  I agree that any action by me to challenge the enforceability of this Agreement must be brought or litigated exclusively in the appropriate state or federal court located in the State of New Jersey.  I also agree that any action by ADP to enforce this Agreement, as well as any related disputes or litigation related to this Agreement, may, but do not have to, be brought in the appropriate state or federal court located in the State of New Jersey.  I agree and consent to the personal jurisdiction and venue of the federal or state courts of New Jersey for resolution of any disputes or litigation arising under or in connection with this Agreement or any challenge to this Agreement and waive any objections or defenses to personal jurisdiction or venue in any such proceeding before any such court.

10.     Survival.  All non-competition, non-solicitation, non-disclosure and non-use, non-recruiting, intellectual property, and Agreement disclosure obligations under paragraphs three (3) through seven (7) of this Agreement shall survive the voluntary or involuntary termination of my employment for any reason and with or without cause, and no dispute regarding any other provisions of this Agreement or regarding my employment or the termination of my employment shall prevent the operation and enforcement of these obligations.

11.     Relief, Remedies, and Enforcement.  I acknowledge that ADP is engaged in a highly competitive business, and the covenants and restrictions contained in this Agreement, including the geographic and temporal restrictions, are reasonably designed to protect ADP's legitimate business interests, including ADP goodwill and client relations, Confidential Information and trade secrets, and the specialized skills and knowledge gained by me and ADP's other employees during our employment. I acknowledge and agree that a breach of any provision of this Agreement by me will cause serious and irreparable damage to ADP that will be difficult to quantify and for which a remedy at law for monetary damages alone may not be adequate.  Accordingly, I agree that if ADP should bring an action to enforce its rights under this Agreement and ADP establishes that I have breached or threatened to breach any of my obligations under this Agreement, ADP shall be entitled to injunctive relief. I also agree that nothing in this Agreement shall be construed to prohibit ADP from pursuing any and all other legal or equitable remedies available to it for breach of any of the provisions of this Agreement, including the disgorgement of any profits, commissions, or fees realized by me, any subsequent employers, any business owned or operated by me, or any of my agents, heirs, or assigns.  I agree that if ADP substantially prevails in any litigation arising out of or relating to this Agreement (including, without limitation, paragraph nine (9) above), ADP shall be entitled to recovery of its reasonable attorneys' fees and associated costs, in addition to any other relief mentioned above. I also agree that that the knowledge, skills, and abilities I possess at the time of commencement of my employment are sufficient to permit me to earn a livelihood satisfactory to me without violating any provision of paragraphs three (3) through seven (7) above, for example, by using such knowledge, skills, and abilities, or some of them, in the service of business that is not competitive with ADP.

12.     Tolling.  The restricted time periods in paragraphs three (3) through six (6) above shall be tolled during any time period that I am in violation of such covenants, as determined by a court of competent jurisdiction, so that ADP may realize the full benefit of its bargain.  This tolling shall include any time period during which litigation is pending, but during which I have continued to violate such protective covenants and a court has declined to enjoin such conduct or I have failed to comply with any such injunction.

13.     Entire Agreement and Validity of Terms.  I agree that I do not rely, and have not relied, upon any representation or statement not set forth herein by ADP or any of ADP's agents, representatives, or attorneys, and that this Agreement may be changed only by a subsequent agreement in writing signed by both parties. I understand that I may have an existing agreement(s) with ADP, through acquisition of a prior employer or otherwise, that may include the same or similar covenants as those in this Agreement, and acknowledge that this Agreement is meant to supplement any such agreement(s) such that the covenants in the agreements that provide ADP with the greatest protection enforceable under applicable law shall control, and that the parties do not intend to create any ambiguity or conflict through the execution of this Agreement that would release me from the obligations I have assumed under the protective covenants in any of these agreements.

14.     Electronic Signature.  I agree that ADP may enforce this Agreement with a copy for which I have provided an electronic signature.

15.     Assignment and Successorship.  This Agreement and ADP's rights and obligations hereunder may be assigned by ADP and shall inure to the benefit of and shall be enforceable by any such assignee, as well as any of ADP's successors in interest.  This Agreement and my rights and obligations may not be assigned by me, but are binding upon my heirs, administrators, executors, and personal representatives.

16.     Waiver.  The waiver by ADP of any breach of this Agreement by me shall not be effective unless in writing signed by the President of ADP, and no such waiver with regards to me or any other person under a similar agreement shall operate or be construed as a waiver of the same type of breach or any other breach on a subsequent occasion by me or any other person or entity.

17.     Legal Counsel.  I agree that I have read this Agreement before signing it, understand its terms, and that I have had the opportunity to have legal counsel review this agreement, prior to signing it, and I acknowledge that I have not been forced or coerced in any manner to sign this Agreement and do so of my own free will.

After reviewing this document close this window to continue the grant acceptance process.

XXX123XXX
10:00:00
ACCEPT

Chase Amundson | LinkedIn

What is LinkedIn?   Join Today   Sign In

# Chase Amundson

**398**
connections

Strategic Account Manager at Ultimate Software
Greater Minneapolis-St. Paul Area   Human Resources

| | |
|---|---|
| Previous | ADP |
| Education | Minnesota State University, Mankato |
| Recommendations | 1 person has recommended Chase |
| Websites | Company Website |

## Join LinkedIn and access Chase's full profile. It's free!

As a LinkedIn member, you'll join 300 million other professionals who are sharing connections, ideas, and opportunities.

- See who you know in common
- Get introduced
- Contact Chase directly

**View Chase's Full Profile**

## Summary

Specializing within the small business sector of Minneapolis Minnesota region.

Specialties:Licensed representative with both series 6 & 63

## Experience

**Strategic Account Manager**
**Ultimate Software**
September 2015 – Present (2 months) | Greater Minneapolis-St. Paul Area



**District Manager**
**ADP**
May 2007 – September 2015 (8 years 5 months)



**Payroll/Retirement Services Representative**
**ADP**
May 2007 – September 2015 (8 years 5 months)

Enrolled with ADP as a Payroll representative and a Retirement Service representative. The position consists of a full-service small business service provider. Assists clients with payroll& tax filing conversion/setup and advising associated with small business 401K retirement plans.

---

Find a different Chase Amundson

First Name     Last Name     Q

Example: Chase Amundson


**Chase Amundson**
District Manager at ADP
United States

More professionals named Chase Amundson

### People Also Viewed


**Ryan Brockhouse**
Retirement Readiness for America


**Megan Kearns**
Vice President of Sales - West Region,
ADP Retirement Services


**Ryan Hopper**


**Todd Johnson**
Client Account Executive at ADP


**Karl Mitchell**
District Manager at ADP Totalsource


**Stephen Ager**


**Kyle Gold**
Sales Executive at ADP


**Laura (Linneman) Peterson**
Strategic Development Manager


**David Benjamin**
Retirement Services District Manager
at ADP


**Christopher DeVito**
Regional Vice President at
Transamerica Retirement Solutions

---

Chase Amundson | LinkedIn

### Skills



What is LinkedIn?   Join Today   Sign In
Internet Explorer cannot disp

What you can try:

- You are not connected to the I
- Retype the address.
- Go back to the previous page.

Most likely causes:

| | | | | |
|---|---|---|---|---|
| 401k | Payroll | ADP Payroll | Customer Service | Retirement |
| Small Business | Employee Benefits | Time Management | Cold Calling | Sales |
| Salesforce.com | Direct Sales | Sales Process | Retirement Planning | |
| Team Building | See 2+ | | | |

### Education

**Minnesota State University, Mankato**
2003 – 2007



**Minnesota State University, Mankato**
Bachelors of Science , International Buisness & Marketing

### Recommendations

A preview of what LinkedIn members have to say about Chase:

" Chase is a detailed oriented person and really knows how to connect with all types of business owners. I work with Chase on a weekly basis as we give referrals back and forth. He always follows up with clients in a timely manner. Great job Chase. "

See more

Sign up to see who recommended Chase

### Honors & Awards

**Additional Honors & Awards**
Graduated MNSU with Academic distinction: Cum Laude
NCSC (National Collegiate Sales Competition) Competitor

### Groups



OFFICIAL Minnesota St
ate University Mankato
Alumni Association



Minnesota Business O
wners & CEOs

ADP Retirement Servic
es

## View Chase's full profile to...

Chase Amundson | LinkedIn

- See who you know in common
- Get Introduced
- Contact Chase directly

View Chase's Full Profile

Not the Chase Amundson you're looking for? View more

LinkedIn member directory: a b c d e f g h i j k l m n o p q r s t u v w x y z more    Browse members by country

© 2015    User Agreement    Privacy Policy    Community Guidelines    Cookie Policy    Copyright Policy    Guest Controls

About Us: Simplifying HR, Payroll & Performance Management

LANGUAGE      BLOG | SOCIAL | NEWSROOM | CONTACT | CAREERS      

# About Ultimate Software

## Ultimate Software. People First.

At Ultimate Software, we have always put our people first. This idea permeates our culture to its core. For over 25 years, it has driven us to create the innovative products and services we offer today. As a result, we enable our customers to put their people first—helping them build the people-centric environments they need to grow and meet their business goals.

We believe software should work for people. Not the other way around. Customers choose us for our sophisticated people management technology delivered in the cloud. But we know that it's the results—how well we improve the personal work experience for you and your employees—that matter most.

With a focus on people in everything we do, we've built UltiPro with comprehensive capabilities and simplicity of use to make your life easier. We give you tools to manage every workforce need—to recruit and retain a high-performing workforce. You get HR, payroll, and talent management in a single solution that seamlessly connects people globally with the information and resources they need to work more effectively.

We devote 100% of our resources to the research, development, and delivery of industry-leading, continuously evolving human capital management (HCM) technology. Our undivided attention has made us experts in the industry—trusted advisors and business partners who can be counted on to deliver sustained excellence in HCM solutions.

Ultimate has more than 2,800 customers with employees in 160 countries, including Adobe Systems Incorporated, Culligan International, Major League Baseball, Pep Boys, Yamaha Corporation of America, and Texas Roadhouse.

Our focus on people is evident and award-winning. Ultimate Software is ranked #21 on FORTUNE magazine's 2015 list of 100 Best Companies to Work For. Previously, Ultimate was ranked #20 on FORTUNE's 2014 list, #9 on its 2013 list and #25 on its 2012 list.

Corporate Headquarters:
Ultimate Software Corporate Offices
2000 Ultimate Way
Weston, FL 33326
Phone: 1-800-432-1729

Ultimate Software Corporate Offices — Canada
144 Bloor St. West

About Us: Simplifying HR, Payroll & Performance Management                    Page 2 of 3

Suite 400
Toronto, Ontario M5S 1M4
Phone: 1-800-432-1729

Founded: 1990
Ownership: Public, Nasdaq: ULTI
2014 Revenue: $505 M
Customers: 2,800, in over 160 countries
Number of Employees: 2,600

Find out how Ultimate Software can help you meet your HR, payroll, and talent management needs.

## Company Information

Company Profile
Read Our Latest Press Releases

## Product Information

UltiPro Product Tours
Whitepapers

## Mission Statement

Our mission is to deliver unified, end-to-end HCM cloud solutions—everything from HR, to payroll, to benefits, to time & attendance, to recruitment, to talent management—to improve the personal work experience for you and your people — the power behind your business.

## The Power of UltiPro



About Us: Simplifying HR, Payroll & Performance Management

**About Us**
Company Culture
Our Mission
Awards & Recognition
Newsroom
Investor Relations
Blog
Social Media
Analyst Relations
Paperless HR & Payroll
Data Security
Careers
Partners

**HCM Solutions**
HRMS / HRIS
Payroll Software
HCM Features
HCM Tours
UltiPro Services
HCM Cloud
Global
Mobile HRMS
Paperless HR & Payroll

**Customer Stories**
By Industry
HR Heroes
Innovation Awards

**Resources**
Whitepapers
HR/Payroll Webcasts
HCM Academy Video Room
ACA Resource Center
Infographics
Case Studies
Millennial Research

**Events**
HR/Payroll Webcasts
HR Workshops
Seminars
Trade Shows
HCM Academy Connections Conference

© 2015 Ultimate Software   |   UltiPro®   |   Privacy Policy   |   Legal Statement   |   Contact Us   |   Email Preferences   |   Site Map

http://www.ultimatesoftware.com/About-Us

10/3/2015

UltiPro: Human Capital Management Solutions

 LANGUAGE    BLOG | SOCIAL | NEWSROOM | CONTACT | CAREERS



# HCM Solutions

## UltiPro® unites all aspects of HR, payroll, and HR talent management

This all-inclusive cloud-based solution delivers serious business benefits for your organization and the most human capital management (HCM) functionality available for the greatest value today.

### Click on a heading below for more information:

### HCM Solution Tours
Whether you are an HR director, HR manager, payroll professional, CFO, executive, supervisor, or hiring manager, Ultimate has a people management solution for you. Check out one of our tours to see how UltiPro's end-to-end HR, payroll, and HR talent management functionality can make everyone in your organization more effective.

### HCM Solution Features
Solution features include HR, Payroll, Benefits Administration, Open Enrollment and Life Events, Time, Attendance, and Scheduling, Payroll Administration, and Tax Management. Other strategic tools include Global HCM, Reporting, Workforce Analytics, and Business Intelligence. There is also talent management functionality, which includes Recruiting, Onboarding, Career Development, Performance Management and Succession Management.

### UltiPro Services
UltiPro Services includes UltiPro Managed Services, UltiPro Partners for Life, Payment Services, W-2 Print Services and UltiPro Check Printing.

### Green Benefits of HR and Payroll Software
Ultimate Software is firmly committed to sustainability strategies in its own business practices and through its people management solutions that replace paper processes. Ultimate has earned a "green business" certification from the Institute for Green Business Certification, Inc. for conservation measures in areas such as waste reduction, recycling, reduction in office material usage, purchasing, and energy savings.



UltiPro: Human Capital Management Solutions



## HCM Solutions
HRMS / HRIS
Payroll Software
HCM Features
HCM Tours
UltiPro Services
HCM Cloud
Global
Mobile HRMS
Paperless HR &
Payroll

## Customer Stories
By Industry
HR Heroes
Innovation
Awards

## Resources
Whitepapers
HR/Payroll
Webcasts
HCM Academy
Video Room
ACA Resource
Center
Infographics
Case Studies
Millennial
Research

## Events
HR/Payroll
Webcasts
HR Workshops
Seminars
Trade Shows
HCM Academy
Connections
Conference

## About Us
Company Culture
Our Mission
Awards &
Recognition
Newsroom
Investor
Relations
Blog
Social Media
Analyst Relations
Paperless HR &
Payroll
Data Security
Careers
Partners

© 2015 Ultimate Software | UltiPro® | Privacy Policy | Legal Statement | Contact Us | Email Preferences | Site Map



Automatic Data Processing
One ADP Boulevard
Roseland, NJ 07068
(T) 973-974-5000
(Direct Dial) 973-974-4078
Joe.Nuzzo@ADP.com

**Via UPS Next Day Air**

September 10, 2015

Mr. Chase Amundson
5524 Knox Ave. S
Minneapolis, MN 55419

Dear Mr. Amundson:

I understand that you have recently left ADP and have joined Ultimate Software Co., Inc. ("Ultimate"). As you are probably aware, Ultimate is a competitor to ADP. Accordingly, I am writing to remind you that you have significant continuing obligations to ADP and to obtain information about your new role at Ultimate to ensure that you are complying with your restrictive covenants with ADP. ADP expects you and Ultimate to fully comply with your obligations under your agreements and the common law. Copies of agreements between you and ADP are enclosed. Understand the following:

- You not work for Ultimate in a similar position within the territory and for the time period set forth in the enclosed agreements dated September 2, 2014, September 3, 2013, September 19, 2012, September 22, 2011, September 23, 2010, and September 24, 2009.

- Also for the period of time set forth in your agreements, neither you, nor anyone else at Ultimate based on information used or provided by you, may solicit, contact or speak with ADP clients, bona fide prospective clients, vendors or business partners or discuss information concerning ADP or its clients, vendors, business partners, services and products.

- You must not use or disclose to Ultimate or others (directly, indirectly or inadvertently) any information concerning or relating to ADP or ADP's services, products, clients, bona fide prospects, vendors, business partners or employees.

- Neither you, nor anyone else at Ultimate based on information used or provided by you, may speak to or contact present or former employees of ADP for solicitation or hiring purposes or provide information to others to solicit or hire ADP employees. Simply put, you should be doing nothing, directly or indirectly, to encourage ADP employees to leave ADP.

- You are obligated to return to ADP all ADP materials, including, but not limited to, documents and electronic media containing (a) the names, contact information and sales information regarding ADP employees; (b) information regarding ADP's products, services and strategies; and (c) the names, addresses and needs of ADP clients, bona fide prospective clients, vendors and business partners.

The ADP Logo and ADP are registered trademarks of ADP, Inc. ©2011 ADP, Inc. Printed in the U.S.A.



Mr. Chase Amundson
September 10, 2015
Page 2

I ask that you confirm that you (1) will not work in a competitive position for the remainder of your non-competition period; (2) will not directly, indirectly or through others solicit, contact, refer or speak with ADP clients, bona fide prospects, vendors, business partners or employees or discuss information concerning ADP or its services, products or employees; (3) will not use or disclose any confidential or proprietary information of ADP; (4) will not contact ADP employees, directly or through others, for solicitation or hiring purposes; (5) have returned all ADP documents and materials, including but not limited to any documents or electronic media containing any information regarding ADP products, services, strategies, clients, bona fide prospective clients or employees; and (6) intend to fully comply with your obligations in the future.

Also, because of the potential competitive overlap between your new role at Ultimate and your former roles at ADP, I ask that you provide a description of the job duties, work location, and any territory associated with your new position at Ultimate so that ADP can verify that you are not violating your agreements with ADP. Indeed, you are required to provide this information pursuant to your September 2, 2014 and September 3, 2013 agreements with ADP, which state:

> I also agree to provide a copy of this Agreement to any subsequent employer, person, or entity to which I intend to provide services that may conflict with any of my obligations in this Agreement prior to engaging in any such activities and to provide ADP in writing the name and address of any such employer, person, or entity and a description of the services I intend to provide prior to engaging in any such activities.

In the event that you decline to provide the information requested above, ADP must assume that you are working in violation of your agreements. Accordingly, in the absence of a satisfactory response to this letter by September 25, 2015, ADP will consider all appropriate actions to protect its valuable rights.

Nothing herein is intended by ADP, nor should it be construed by you, as a waiver or relinquishment of any rights or remedies which ADP may have in this matter, and all such rights and remedies are hereby specifically reserved.

Very truly yours,

Joseph C. Nuzzo, Jr.
Counsel

The ADP Logo and ADP are registered trademarks of ADP, Inc. ©2011 ADP, Inc. Printed in the U.S.A.



Mr. Chase Amundson
September 10, 2015
Page 3

Enclosures

cc:   Robert Manne, Esq.
      Ultimate Software Group, Inc.
      2000 Ultimate Way
      Weston, FL 33326

The ADP Logo and ADP Are registered trademarks of ADP, Inc. ©2011 ADP, Inc. Printed in the U S A r.

EXHIBIT B

2601771v

LINDABURY, McCORMICK, ESTABROOK & COOPER
53 Cardinal Drive
P.O. Box 2369
Westfield, New Jersey 07091
(908) 233-6800
Attorneys for Defendant
Schmidt – ID#016301977

| | |
|---|---|
| ADP, LLC,<br><br>                    Plaintiff<br><br>vs<br><br>CHASE AMUNDSON<br>                    Defendant | : SUPERIOR COURT OF NEW JERSEY<br>: CHANCERY DIVISION: ESSEX  :<br>:COUNTY<br>: DOCKET NO. C-268-15<br>:<br>:<br>:         NOTICE OF FILING<br>:      OF NOTICE OF REMOVAL<br>:<br>:<br>: |

TO:   CLERK
      Superior Court of New Jersey
      Chancery Division
      Essex County
      Wilentz Justice Complex
      212 Washington Street
      Newark, New Jersey 07102

      Harris S. Freier, Esq.
      Genova Burns
      494 Broad Street
      Newark, New Jersey 07102
      Attorneys for Plaintiff

      PLEASE TAKE NOTICE that on  December 29, 2015, the Defendant, Chase Amundson,

filed with the United States District Court for the District of New Jersey the attached **Notice of**

2601771v

**Removal**, a true and correct copy of which is annexed hereto as Exhibit A and hereby served upon you.

Lindabury, McCormick, Estabrook & Cooper
Attorneys for Defendant

John H. Schmidt, Jr.

Dated: December 30, 2015

2601771v